REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1911

September Term, 2013

SELECT PORTFOLIO SERVICING, INC.

v.

SADDLEBROOK WEST
UTILITY COMPANY, LLC, ET AL.

Eyler, Deborah S.,
Woodward,
Berger,

JJ.

Opinion by Eyler, Deborah S., J.

Filed: August 31, 2016

In this appeal, we hold that a Declaration recorded by the developer of a subdivision created a lien that secured payment of water and sewer charges; the lien could be enforced under the terms of the Declaration, without resort to the Maryland Contract Lien Act; and the lien has priority over a later recorded refinance deed of trust ("DOT") against the property. Select Portfolio Servicing, Inc. ("SPS"), the appellant, is the holder of the DOT. Saddlebrook West, LLC ("Saddlebrook"), and Saddlebrook West Utility Company, LLC ("Utility"), the appellees, are the developer and its wholly owned subsidiary. Our decision affirms a declaratory judgment entered by the Circuit Court for Prince George's County.

## FACTS AND PROCEEDINGS

In 1999, Saddlebrook embarked on a plan to purchase raw land in Bowie on which to build the Saddlebrook West residential subdivision ("the Subdivision"). The first phase of the Subdivision was to be comprised of 187 lots on which single family homes would be built. That is the only phase of the Subdivision this case concerns.

The parcel of land is located within the Washington Suburban Sanitary District. In December of 1999, Saddlebrook and the Washington Suburban Sanitary Commission ("WSSC") entered into a Memorandum of Understanding ("MOU") by which the WSSC authorized Saddlebrook to "construct water and/or sewer extensions" within the planned Subdivision, subject to the WSSC's inspection and approval. Saddlebrook purchased bonds to secure its obligation to perform under the MOU.

On February 4, 2000, Saddlebrook purchased the parcel of raw land by deed that

2

was recorded in the Land Records for Prince George's County ("Land Records") on February 17, 2000. (Liber 13643, Folio 461). Then, on April 4, 2000, Saddlebrook, as "Declarant," executed a "Declaration of Deferred Water and Sewer Charges" ("the Declaration") in favor of Utility. The Declaration imposes an annual Water and Sewer Charge on the owner of each lot in the Subdivision, to be paid by the lot owner to Utility.

As relevant to the issues in this case, the Declaration states:

- Utility intends to provide water and sewer infrastructure and connections for the lots.[1]

- To recoup that cost, Saddlebrook will establish an annual Water and Sewer Charge on each lot.

- By accepting his deed, the lot owner agrees to pay Utility the Water and Sewer Charge for the lot, and any past due and unpaid such charge. The charge for each lot is $700 per year, for 23 years. The charge comes due on January 1 of the year following the owner's purchase of the lot.[2] (Saddlebrook and any "Builder" are not lot owners.[3])

- Also by accepting his deed, the lot owner "grants [Utility] a lien to

---

[1] The Declaration provides that the WSSC shall be responsible for maintaining the Water and Sewer Systems within public easements and that each lot owner shall be responsible for maintaining the systems on his/her lot. The WSSC shall supply water and sewer services to each lot, and each lot owner shall be responsible to pay the WSSC for those services.

[2] A lot owner may prepay the total outstanding Water and Sewer Charge at any time, at a 6% discount. Saddlebrook and/or Utility may assign or transfer any of the rights or powers granted by the Declaration.

[3] A "Builder" is a person or entity who acquires a lot or lots from Saddlebrook "for the purpose of constructing residential dwelling units on such [l]ots for sale or lease to others."

3

secure payment of" the Water and Sewer Charge. The lien "shall have priority from the date upon which this Declaration is recorded . . . over any subsequently recorded or created lien, deed of trust, mortgage or other instrument encumbering" the lot.

- The lot owner "grants to [Utility] a power of sale, and assents to the entry of a decree and order for the sale of th[e l]ot upon a default by the [lot o]wner under this Declaration."

- If a lot owner fails to pay the Water and Sewer Charge, Utility shall be entitled to all available legal or equitable relief, including acceleration of the Water and Sewer Charge; an action at law against the lot owner; foreclosure on the "lien" "in the manner now or hereafter provided for the foreclosure of mortgages, deeds of trust or other liens on real property in . . . Maryland"; and foreclosure on the "lien" under the Maryland Contract Lien Act.

- All lots will be held, encumbered, sold, etc., "subject to the covenants, conditions, restrictions, obligations and charges set forth in this Declaration," which "shall run with such [l]ots and be binding on all parties having any right, title or interest in all or any portion of such [l]ots," etc., and "shall inure to the benefit of [Saddlebrook], Utility and their respective successors, transferees and assigns."

- "All provisions of this Declaration, including the benefits and burdens, shall touch, concern and run with the land[.]"

On May 17, 2000, the Declaration was recorded in the Land Records. (Liber 13818, Folio 503). An exhibit to the Declaration identifies by lot, block, and plat number the 187 lots to which the Declaration pertains. A "Land Instrument Intake Sheet" for the Declaration shows that Saddlebrook paid a $75 recordation charge and a $2 surcharge. No recordation or transfer taxes were charged and none were paid.

Saddlebrook paid W.F. Wilson & Sons, Inc. ("Wilson"), to construct and install

4

the water and sewer facilities for the 187 lots. By letter of November 21, 2000, the WSSC certified that the conditions of the MOU had been satisfied and that those lots were being released for service. Almost a year later, on October 3, 2001, Saddlebrook entered into a "Lot Purchase Agreement" with Maryland Homes, LLC ("Maryland Homes"), a builder, for the 187 lots. A copy of the Declaration was attached to the Lot Purchase Agreement and "incorporated [t]herein by reference." Under the terms of the Lot Purchase Agreement, Maryland Homes agreed to disclose the existence of an "annual deferred water and sewer benefit charge" to any purchaser of a developed lot. It further agreed "to include in sales contracts to home purchasers for homes to be constructed all required and appropriate notices/disclosures pertaining to the Water and Sewer Systems mandated by applicable law[4] and acknowledging receipt by the home purchaser of such disclosures, which must be furnished at the time of contract."

---

[4] The Real Property Article includes notice provisions for the sale of any residential real property in Maryland that is subject to deferred water and sewer charges. Md. Code (1974, 1996 Repl. Vol., 2000 Supp.), section 14-117(b) of the Real Property Article ("RP") provides:

(b)(1) In this subsection, "water and sewer authority" includes a person to which the duties and responsibilities of the [WSSC] have been delegated by a written agreement or in accordance with a local ordinance.

(2) A contract for the initial sale of improved, residential real property to a member of the public who intends to occupy or rent the property for residential purposes shall disclose the estimated cost, as established by the appropriate water and sewer authority, of any deferred water and sewer charges for which the purchaser may become liable.

5

The 187 lots were conveyed to Maryland Homes by separate deeds that covered one or more lots. The property at issue in this case is lot 5, block J, Plat 20 of the Subdivision, later designated 8201 River Park Road ("the Property"). A deed conveying that lot and three others to Maryland Homes was recorded in the Land Records on November 13, 2001. (Liber 15170, Folio 694). It states that it is subject to "all easements, covenants and restrictions of record."

Maryland Homes built single-family homes on all 187 lots. On April 1, 2002, Charles Bradley, Jr., purchased the Property for $347,388. He financed the transaction by a $351,922 purchase-money mortgage. The deed conveying the Property to Mr. Bradley was recorded in the Land Records on April 23, 2002. (Liber 15727, Folio 361). It states that it is made "SUBJECT to all easements, covenants, and restrictions of record."

On January 1, 2003, Mr. Bradley's first annual $700 Water and Sewer Charge came due. He did not pay it. He also did not pay the $700 Water and Sewer Charge that came due a year later, on January 1, 2004.

On March 1, 2004, pursuant to the Maryland Contract Lien Act ("MCLA"), Md. Code (1974, 2003 Repl. Vol.), sections 14-201–206, of the Real Property Article ("RP"), Tidewater Property Management, Inc., acting as Utility's agent, recorded in the Land Records a "Statement of Lien" against the Property, for $1,210, for the unpaid Water and Sewer Charges. (Liber 19023, Folio 451). On November 17, 2004, it recorded a second

6

"Statement of Lien" against the Property, for $1,578.80, also for the unpaid Water and Sewer Charges. (Liber 20718, Folio 127). Both Statements of Lien recite that the Property is subject to the Declaration and that, pursuant to the MCLA, is subject to a lien for Water and Sewer Charges, plus the cost to record the Statements of Lien.

The next year, by deed dated January 6, 2005, Mr. Bradley conveyed the Property to Sherrylyn Mitchell for $565,000. The deed was recorded in the Land Records on March 8, 2005. (Liber 21579, Folio 001). The deed does not include a "subject to all easements, covenants, and restrictions of record" clause, and makes no reference to the Declaration. In the deed, Mr. Bradley represents that he "has not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed[.]"

Ms. Mitchell had been living in the Property since 2002, but the record does not disclose the circumstances under which she was living there or her relationship to Mr. Bradley.[5] A Land Instrument Intake Sheet shows that Ms. Mitchell financed the purchase with a $480,250 loan, and that a deed of trust securing the loan against the Property was recorded in the Land Records. The deed of trust is not in the record, however, and there is nothing in the record showing the source of Ms. Mitchell's loan. The record includes a form document entitled "NOTICE TO PURCHASER OF DEFERRED WATER AND SEWER CHARGES," acknowledging that the Property is subject to the annual Water

_____

[5] And this is true even though, as we shall explain, Ms. Mitchell was a party to the declaratory judgment action and testified at trial.

and Sewer Charge of $700. Ms. Mitchell's signature is on the document, next to the date "9-1-01," also in her handwriting. The document also is signed by a representative of Maryland Homes, which is described as the "Seller." That signature is dated "9/4/01." These dates are long before the conveyance to Ms. Mitchell, and indeed pre-date the conveyance by Maryland Homes to Mr. Bradley.

The Statements of Lien were not paid, cleared, and released upon closing of the sale of the Property by Mr. Bradley to Ms. Mitchell. Nothing in the record explains why that did not happen.

Sometime in early 2005, Ms. Mitchell decided to refinance. She applied to Long Beach Mortgage Company ("Long Beach") for a $552,000 loan. Before extending the loan, Long Beach ordered a two-party title search of the Property, *i.e.*, a search that included Ms. Mitchell and Mr. Bradley, but not prior owners. The search did not reveal the Declaration. Also, the person who performed the title search did not find the recorded Statements of Lien. On May 25, 2006, Ms. Mitchell settled on the refinance loan. The Statements of Lien were not paid, cleared, and released at closing. Ms. Mitchell's refinance loan was secured by the DOT to Long Beach, which was recorded in the Land Records on August 18, 2006. (Liber 25810, Folio 228).[6] The Statements of Lien expired in 2007. *See* RP § 14-204(c) (an action to foreclose under a statement of

---

[6] The DOT was re-recorded on November 10, 2009, because as originally recorded it did not contain an adequate description of the Property. (Liber 31142, Folio 555).

lien must be commenced within three years of the date of recordation).[7]

On October 7, 2010, in the Circuit Court for Prince George's County, agents of Utility filed an order to docket, seeking to foreclose on its lien against the Property under the Declaration, for non-payment of the Water and Sewer Charges. By then, Long Beach had sold Ms. Mitchell's loan to JP Morgan Chase Bank, N.A. ("Chase"). On March 5, 2012, Chase filed a motion to stay and dismiss. That same day, it filed the declaratory judgment action that gives rise to this appeal. Utility canceled the foreclosure sale and voluntarily dismissed the foreclosure case.

Chase filed a first amended complaint in the declaratory judgment action, which became the operative complaint. Saddlebrook, Utility, Ms. Mitchell, the Saddlebrook West Homeowners Association, Inc. ("the HOA"), and Utility's agents in the foreclosure action ("the substitute trustees") were named as defendants. Also named were the Clerk of the Circuit Court for Prince George's County ("Clerk"), the Director of the Prince George's County Office of Finance ("Finance Director"), and the Director of the State Department of Assessments and Taxation ("SDAT Director") (collectively, the "public defendants").

Chase alleged that the Declaration is not a lien instrument and therefore it did not create a lien against the Property. It pointed out that if the Declaration were a lien

___

[7] This section was amended in 2008 to extend the period in which to commence an action to foreclose to 12 years. *See* 2008 Md. Laws, Ch. 286.

instrument there would have been no need for Utility to have obtained "Statements of Lien" under the MCLA.  It asserted that, although the Declaration purports to create a lien, it was filed in the Land Records without payment of approximately $60,000 in recordation and transfer taxes required to record a lien instrument securing more than $3 million in Water and Sewer Charges.[8]

In Count I, Chase sought a finding that the Declaration is invalid and the DOT is the first priority lien against the Property.  In Count II, it sought mandamus relief against the public defendants, requiring them to "either . . . collect the appropriate taxes from . . . Utility or . . . remove the Declaration from the Land Records."[9]

The circuit court granted summary judgment in favor of the public defendants in an order stating that "the dispute concerning the priority of the lien must be resolved between [Chase] and [Utility and u]ntil that time (if ever) no justiciable controversy

---

[8] Chase further asserted that Saddlebrook and Utility had "created and recorded" the Declaration to "artificially suppress prices for the lots in the [Subdivision] . . . by not including the cost of water and sewer improvements in the purchase price of each lot."

[9] In a third count, Chase alleged that Saddlebrook and Utility had engaged in fraud by "draft[ing]" and "record[ing]" the Declaration "in such a manner as to conceal from the taxing authorities and the public that the Declaration was intended to be a lien instrument."  It sought $750,000 in compensatory damages, $1,500,000 in punitive damages, and attorneys' fees and costs.  Chase voluntarily dismissed that count with prejudice.

exists between [Chase and the public defendants]."[10]   The remaining parties engaged in

discovery.

On September 17 and 18, 2013, Chase's declaratory judgment action was tried to

the court against Saddlebrook, Utility, and Ms. Mitchell (who was self-represented).

---

[10] As mentioned, Chase also named the HOA and the substitute trustees as defendants.  Both were served on June 7, 2012.

The HOA answered the first amended complaint on July 20, 2012 and admitted all of the relevant allegations.  On August 16, 2012, Chase filed a "Motion for Entry of Consent Order."  The pertinent terms of the consent order were that the HOA had a lien interest in the Property; that it "consent[ed] and agree[d] that [its] lien interest . . . is junior and subordinate in priority to the lien of the [DOT]"; that the consent order would be recorded in the Land Records; and that upon entry of the consent order, the HOA would be dismissed as a defendant.  Over six months later, the Clerk filed a partial opposition to the motion for consent order, arguing that the consent order was not an appropriate document to be recorded in the Land Records.  The record does not reflect that the motion for consent order ever was ruled upon by the circuit court.  As a result, the HOA never was dismissed as a party.

The substitute trustees never answered the first amended complaint and also were not dismissed as parties.

Ordinarily, a judgment that "adjudicates fewer than all of the claims in an action . . . or . . . less than an entire claim, *or that adjudicates the rights and liabilities of fewer than all the parties to the action*" is not final and appealable.  Md. Rule 2-602(a) (emphasis added).  The HOA and the substitute trustees were named as defendants because they were interested parties whose rights or interests relative to the Property could be affected by the declaration.  *See* Md. Code (1973, 2013 Repl. Vol.), section 3-405 of the Courts and Judicial Proceedings Article.  The first amended complaint sought no relief against them, however.  The court's entry of the declaratory judgment adjudicated the rights and liabilities of all of the parties and was a final, appealable judgment.

Moreover, even if existence of the outstanding defendants made the judgment non-final, we would exercise our discretion under Rule 8-602(e) to enter a final judgment on our own initiative.

Chase called three fact witnesses: John C. Puiles,[11] a member of Saddlebrook and the managing member of Utility (adversely); Ms. Mitchell (also adversely); and Albert Smith, Jr., Chase's custodian of records.

Mr. Puiles recounted the history of the Subdivision and testified that Saddlebrook paid Wilson to construct and install the water and sewer facilities for the 187 lots. Saddlebrook hired counsel to draft the Declaration. Mr. Puiles identified the MOU between the WSSC and Saddlebrook and the contract between Saddlebrook and Wilson, under which those facilities in fact were constructed and installed and Wilson was paid. He identified the Declaration and the Lot Purchase Agreement. He stated that at the time of settlement on the sales of lots by Maryland Homes to lot owners, Maryland Homes was required "by contract," *i.e.*, under the terms of the Lot Purchase Agreement, to provide a "NOTICE TO PURCHASER OF DEFERRED WATER AND SEWER CHARGES" like the one signed by Mitchell. These documents all were moved into evidence.

Ms. Mitchell testified that since purchasing the Property, she has received bills for Water and Sewer Charges. She did not testify whether she has paid these charges.[12]

---

[11] Mr. Puiles's name appears elsewhere in the record as "Pyles." We use the spelling he gave during his testimony at the trial.

[12] Ms. Mitchell also did not testify whether she has made her monthly payments on the refinance loan. She stated, however, that "2009 [wa]s the last time [Chase had] made a demand for payment" on that loan. Comments by counsel for Saddlebrook and

(Continued…)

12

Chase called three expert witnesses. Kristy Wingate, a title abstractor, testified that lenders typically only order a two-party examination for a refinance loan, and such an examination would *not* have revealed the Declaration. If competently performed, such an examination would have revealed the Statements of Lien, however, because they were recorded after Mr. Bradley took title to the Property. And the Statements of Lien would have resulted in the discovery of the Declaration, because they referenced the Declaration by its Liber and Folio numbers.[13] According to Ms. Wingate, if the Declaration had been discovered in the title search, the industry standard would have been to report it as an exception to the title, not as a lien or encumbrance.

Lynne Boileau, an attorney for a title insurance company, opined as well that a declaration for water and sewer charges, such as the Declaration in this case, would be treated as an exception on a title report, *i.e.*, it would not be covered by the title insurance policy. It "affects the property and the use of the property and the way the property owner can use the property. So [the] property conveys subject to [the Declaration], and it is an important document but we do not view it as an existing lien." However, "a lien could arise if these charges are not paid." Specifically, she opined that if the water and

(…continued)
Utility in opening statement intimated that there is a foreclosure action against the Property, initiated by substitute trustees for Chase, that remains unresolved, likely because of the lien priority dispute between Chase and Saddlebrook/Utility.

[13] Every expert witness who testified agreed with this.

13

sewer charge is not paid, "a statement of lien can be recorded [under the MCLA], and that we do view as an encumbrance on property that would have to be paid, cleared and released." Ms. Boileau further opined that were a title insurance company to consider a declaration of this sort as creating a lien against the property being conveyed, it would not issue a title insurance policy "unless [the] property was either released from the lien altogether or it was subordinated, the lien was subordinated to [the loan being issued]."

Shawn Goldfaden, a lawyer and underwriter for a title insurance company, opined that the Declaration is a "notice instrument" not a "lien instrument." If he had been underwriting a title insurance policy for the Property, he would have agreed "to insure title with [the Declaration] shown as an exception in the policy itself." The Declaration would not need to be "satisfied, subordinated, or paid" before a title commitment was issued. This is so, Mr. Goldfaden explained, because the Declaration gives notice of an annual assessment but does not create a present lien interest that "trump[s] . . . priority" over a properly recorded deed of trust securing a loan.

At the close of Chase's case-in-chief, the court granted judgment in favor of Saddlebrook and Utility on the claim that the Declaration could not be a valid lien instrument because recordation and transfer taxes were not paid.

In their case, Saddlebrook and Utility called Brian Bichy, a real estate lawyer, who was accepted as an expert in that field. Mr. Bichy testified that he routinely drafts declarations for water and sewer charges that are nearly identical to the Declaration. He

14

has initiated foreclosure proceedings under the power of sale provisions in those declarations; and in some of those cases, courts have ratified foreclosure sales. He explained that in drafting these declarations he relies upon certain provisions of the Anne Arundel County Code ("AACC") pertaining to deferred water and sewer charges. He acknowledged that there is no similar provision in the Prince George's County Code ("PGCC").

Mr. Bichy opined that the Declaration "creates a lien for the water and sewer charges based on the covenant that's recorded in the specific paragraph where each owner is granting a lien for repayment of the water and sewer charges, as well as granting a power of sale to execute on that lien." He further opined that the Declaration is a covenant running with the land and an "interest against" the Property. He did not express an opinion about the lien priority of the Declaration.

After the evidence phase of the case concluded and the court heard closing arguments, the court directed counsel to submit proposed findings of fact and conclusions of law.

Chase proposed the following: 1) the Declaration is void because it violates the Rule Against Perpetuities; 2) the Declaration is not a covenant running with the land because it does not touch and concern the land and because it lacks vertical privity; 3) the Declaration does not create a lien, but is a contractual agreement that, when a lot owner defaults upon payment of the annual water and sewer charge, Utility may obtain a lien; 4)

15

in Maryland, the MCLA is the only vehicle by which to obtain a lien against real property based on a contract; 5) a lien obtained under the MCLA does not relate back in time, for recording purposes, to the date of the contractual agreement to create a lien; 6) the Statements of Lien that Utility obtained against the Property were valid, but because they expired, they had no impact on the priority of the DOT; and 7) the Declaration is not enforceable against third parties because recordation and transfer taxes were not paid.

Saddlebrook and Utility proposed the following: 1) the Declaration created a lien against each lot that is subject to the Water and Sewer Charges, including the Property; 2) the lien was effective on the date the Declaration was recorded, which was before the DOT was recorded, and therefore the lien has priority over the DOT; 3) the Declaration satisfies the "touch and concern" and vertical privity requirements for a covenant running with the land; 4) the Declaration does not violate the Rule Against Perpetuities; and 5) the Declaration permits Saddlebrook/Utility to obtain a Statement of Lien under the MCLA, but that is not the only remedy available to it, nor does that mean that the Declaration did not create a lien.

On November 20, 2013, the court docketed its final opinion and order.[14] It made the following findings of fact and conclusions of law.

---

[14] The court first issued an opinion and order on November 5, 2013. On November 20, 2013, it docketed an "Amended Opinion and Order of the Court," to correct a typographical error. Our reference to the final opinion of the court is to that amended opinion.

16

Under the terms of the Declaration, Saddlebrook was required to install the water and sewer facilities for the Subdivision. Because Saddlebrook fulfilled that obligation, the Declaration "create[d] a lien." The lien is "what some refer to as a 'super lien.' No developer would undertake this development process without legal assurances of payment and assurances that such payment would be a priority." The lien on a lot "take[s] effect" when the owner takes title to the lot. In this case, the lien on the Property took effect in 2002, when Mr. Bradley purchased the Property. That preceded the recording of the DOT in the Land Records. Because it was reasonable to infer that the lots in the first phase of the Subdivision would be sold within the perpetuities period, and therefore the lien for each lot would arise within that period, the Declaration does not violate the Rule Against Perpetuities and is not void. The lien created by the Declaration "is a covenant running with the land"; Saddlebrook benefits from the payment by lot owners of the Water and Sewer Charges, and the charges "certainly touch the land."

The court further found that because the Declaration was recorded in the Land Records, the "world" was on constructive notice of the lien it created. Long Beach's two-party title search did not reveal the Declaration, "despite references to it in a number of recorded filings in the land records." And Long Beach did not order the type of title search "that everyone agrees would have revealed the Declaration." "One who does not request a thorough search . . . does so at his peril. . . . Here, [Chase] comes to court complaining that it shouldn't be bound by something it didn't know about when in fact it

17

was by its own lack of a competent search that it was unaware." Finally, Saddlebrook did not pay recordation and transfer taxes when the Declaration was recorded in the Land Records because none were charged. Any "mistake" in this regard "was the [C]ounty's mistake" and did not affect the validity of the Declaration.

The court ruled that the Declaration "is a valid, enforceable first-priority lien encumbering the [P]roperty . . . ."[15] Although the court did not expressly address Chase's argument that the MCLA was the sole vehicle for enforcement of the lien, it was implicit in the court's lien priority determination that it rejected that argument.

Chase noted a timely appeal. During the pendency of the appeal, Chase sold its interest in the DOT to SPS, and SPS was substituted for Chase as the appellant in this Court.

SPS presents four questions for review, which we have reordered and rephrased:

I.      Did the trial court err in ruling that the Declaration is not void as in violation of the Rule Against Perpetuities?

II.     Did the trial court err in ruling that the Declaration is a covenant running with the land and therefore binds downstream purchasers?

III.    Did the trial court err in ruling that the fact that recordation and transfer taxes were not paid did not render the Declaration unenforceable as a lien instrument?

---

[15] The court also ruled that Chase, the then-current holder of the promissory note secured by the DOT, had standing to bring suit and that joinder of the owners of the other 186 lots subject to the Declaration was not required. Those rulings are not being challenged on appeal.

18

IV.     Did the trial court err in ruling that the Declaration created a lien that could be enforced other than through the process set forth in the Maryland Contract Lien Act, and that the lien created by the Declaration has priority over the DOT?

Finding no error on the part of the trial court, we shall affirm the judgment.

## DISCUSSION

Before delving into the issues, we shall summarize them, how they interrelate, and how SPS maintains their resolution will affect the outcome of this appeal. First, is any lien the Declaration created of no effect because the Declaration violates the Rule Against Perpetuities and therefore is void? If the answer to that question is yes, it is dispositive of the entire appeal. Second, and obviously alternatively, is any lien created by the Declaration a covenant running with the land? A negative answer to that question also is dispositive, because, if the lien is not a covenant running with the land, Ms. Mitchell, as a subsequent purchaser, would not be bound by the obligation to pay the Water and Sewer Charges, and the lien would be of no effect as to her or Chase. Third, and likewise alternatively, does the fact that recordation and transfer taxes were not paid when the Declaration was recorded mean that the Declaration could not create a lien? An affirmative answer to this question is dispositive as well.

Finally, if none of those issues is resolved dispositively, did the Declaration create a lien against the Property to secure payment of Water and Sewer Charges, effective either when the Declaration was recorded or (as the trial court found) when Mr. Bradley

19

took title to the Property? If so, can the lien be enforced by Utility, exercising its power of sale under the Declaration, through a foreclosure action against the Property, or can the lien only be enforced pursuant to the MCLA? If the lien only can be enforced under the MCLA, SPS's DOT has first priority status because the Statements of Lien that Utility obtained under the MCLA have expired, and any Statement of Lien it may obtain in the future will be effective only from the date it is recorded. If the lien can be enforced outside the MCLA process, then whether the lien takes priority over a competing lien held by a third party will depend, in part, on whether the third party had adequate notice of the lien created by the Declaration when its own lien was recorded.

## I.

## Rule Against Perpetuities

Under the rule against perpetuities, "[n]o interest [in property] is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Dorado Ltd. P'ship v. Broadneck Dev. Corp.* 317 Md. 148, 152 (1989) (quoting *Fitzpatrick v. Mercantile-Safe Deposit & Tr. Co.*, 220 Md. 534, 541 (1959), in turn quoting Gray, *The Rule Against Perpetuities*, § 201 (4th ed. 1942)). The rule against perpetuities applies to a contract that "creates an equitable right in real property." *Id.* at 152. It is designed to invalidate interests in real property that "vest too remotely." *Fitzpatrick*, 220 Md. at 541. "The term 'vested,' as used in the law of property, signifies that there has been the fixation of a present right to either the immediate or future

20

enjoyment of property." *Chism v. Reese*, 190 Md. 311, 320 (1948) (citing *Curtis v. Md. Baptist Union Ass'n*, 176 Md. 430, 438 (1939)). "The interest must vest in the sense of becoming a vested remainder." *Id*.

In *Brown v. Parran*, 120 Md. App. 653 (1998), we gave the following straightforward description of the rule against perpetuities and the reasons underlying it:

> The rule against perpetuities is a limitation on contingent future interests in property. The rule prevents property interests from vesting too remotely, so that current owners will not be discouraged from making the most effective uses of their properties. The rule is concerned with restrictions that render title uncertain as well as restraints on alienation. Under the traditional rule adhered to in Maryland, the future interest, at the effective date of the instrument creating it, must vest within the period of the rule (life in being plus 21 years).
>
> . . . . [A] court must construe the conveyance in question independent of the rule [against perpetuities] and then apply the rule. The rule against perpetuities applies to contracts for the sale of real property. . . . If a condition of the contract possibly may cause legal title to vest in the purchaser outside the period of the rule, the contract violates the rule and is not enforceable.

*Id.* at 658–59 (citations omitted).

SPS contends the Declaration violates the rule against perpetuities, and therefore "is unenforceable." It argues as follows. When the Declaration was executed and recorded in the Land Records in April and May of 2000, Saddlebrook intended to subdivide its raw land into lots, install water and sewer facilities, and sell the lots to a builder, which would build single family homes on the lots and sell them to individual owners. Under the Declaration as interpreted by the trial court, when an individual owner

21

takes title to his lot, he grants the Utility a lien against the lot for Water and Sewer Charges. At that point, the lien vests. When the Declaration was executed and recorded, however, it was not possible to know that any of the 187 lots in the first phase of the Subdivision ever would be sold to individual lot owners within 21 years of a life in being. Therefore, according to SPS, "the future vesting of [the] lien interest violates the Rule Against Perpetuities, because it may vest too remotely." SPS asserts that the trial court erred as a matter of law by reading into the Declaration a reasonable time, within the perpetuities period, by which the lots would be sold to individual owners and the lien would vest.

SPS relies upon *Dorado,* 317 Md. 148, to support its argument. In that case, two parties entered into a contract for the sale of 112 lots of real property, which the buyer intended to develop. The contract stated:

> Buyer agrees to purchase and settle on [the 112] lots covered by the Contract of Sale by payment of the purchase price in cash *not later than ninety (90) days after the Seller has delivered to Buyer evidence of sewer allocations for such lots.* Time is of the essence of all the provisions of the Contract of Sale.

*Id*. at 150 (emphasis added).

The county in which the lots were located had imposed a moratorium on sewer allocations. The seller attempted to obtain sewer allocations, but could not do so because of the moratorium. The seller brought a declaratory judgment action against the buyer, seeking an adjudication, on several alternative grounds, that the contract of sale was void.

22

One argument the seller advanced was that the contract violated the rule against perpetuities because the buyer's fee simple interest in the lots might not vest within the perpetuities period. Specifically, the seller argued that whether legal title to the lots would be delivered to the buyer was contingent upon the seller's obtaining sewer allocations, and there was no certainty that that ever would happen. The circuit court rejected that argument and the seller's alternative arguments. On appeal, this Court reversed based on an alternative argument.

The Court of Appeals took the case and held that the contract of sale violated the rule against perpetuities and therefore was void. It recognized that in some circumstances, when a contract does not specify a time for performance, the court may imply a reasonable time for performance. It concluded that it is not proper for a court to do so when the time for performance is contingent upon the happening of an event outside the control of either party to the contract. The seller had applied for the sewer allocations, which were not granted because of the moratorium, and there was nothing more either the buyer or the seller could do to satisfy the sewer allocation contingency. Only the county could lift the moratorium and grant the sewer allocations, and whether it would do so within the perpetuities period was unknown. The Court explained, "[W]here the occurrence of the condition precedent to conveyance is beyond the control of the parties, a reasonable time for performance, less than the perpetuities period, cannot be implied." 317 Md. at 158.

Saddlebrook and Utility point out that several cases decided by this Court have distinguished *Dorado*, thereby clarifying its holding. In *Stewart v. Tuli*, 82 Md. App. 726 (1990), sellers of residential real property entered into a contract of sale with a buyer, but declared the contract void when the buyer's financial information was not satisfactory. The sellers then entered into a second contract of sale with another buyer. An addendum provided that if the first buyer "attempted to keep 'his contract alive,'" the second buyer would be relieved from going to settlement until such time as the sellers could grant clear title. *Id.* at 729. The contract also included a clause concerning "TITLE," in which the sellers agreed to convey title and that, "'[i]n case legal steps are necessary to perfect the title, such action must be taken promptly by [the sellers] at [their] own expense'" and the time for settlement would be "'extended for the period necessary for such prompt action.'" *Id.* at 735.

The first buyer filed a complaint for specific performance of his contract against the sellers, arguing, among other things, that the second contract was void because it violated the rule against perpetuities. The second buyer filed a motion to intervene, which the circuit court denied. The second buyer appealed. We held that the second buyer was entitled to intervene as of right, and went on to address the perpetuities issue.

Relying upon *Dorado*, the first buyer argued that the provision in the second contract extending the time for performance until the sellers could convey clear title made the time for performance so indefinite that it could not be said that clear title would

24

be delivered within the perpetuities period. We rejected that argument, explaining that it was central to the Court's holding in *Dorado* that the occurrence of a condition precedent to the sale was in the hands of a third party and outside the control of the parties. By contrast, the sellers had it within their control to bring an action in court to obtain clear title, and "the contract mandated that any title clearing litigation be completed within a reasonable period of time." *Id*. at 736. Even though the outcome of any such litigation would be in the hands of a court, not the sellers, the title clearing litigation was to be resolved in a reasonable period of time, and "[i]t would be ridiculous to suggest that a reasonable period of time would exceed a life in being and 21 years." *Id*.

The year after *Stewart* was decided, this Court again rejected an argument that a contract for the sale of land violated the rule against perpetuities because the time for performance had been extended indefinitely until the sellers could convey clear title. In *Hays v. Coe*, 88 Md. App. 491 (1991), unlike in *Stewart*, there was no contract provision requiring that action to correct title problems be taken within a reasonable period of time. Nevertheless, we read the contract of sale to imply a reasonable time in which to correct any title defects. We held that that time would occur within the perpetuities period, and therefore the contract did not violate the rule against perpetuities. The Court of Appeals vacated our decision on another ground, but held that the perpetuities issue was properly decided. *Coe v. Hays*, 328 Md. 350, 362 (1992).

Finally, in *Brown v. Parran*, 120 Md. App. 653, we synthesized the holdings in

25

*Dorado*, *Stewart*, and *Hays*. The parties' contract for the sale of real property conditioned settlement upon the issuance of building permits for 21 building sites. It did not specify a time by which that condition had to be performed, however. The circuit court, citing *Dorado*, held that the contract violated the rule against perpetuities because the condition might not be satisfied within the perpetuities period.

Distinguishing *Dorado*, and applying *Stewart* and *Hays*, this Court reversed. We explained that, in *Dorado*, the process that had to be undertaken to satisfy the sewer allocation contingency was not available at all, due to the moratorium. So, not only was the process in the hands of a third party, the process could not be used; and the "duration of [the] moratorium [was] uncertain and dependent upon governmental and political policy decisions." 120 Md. App. at 664. In that circumstance, "a reasonable time to satisfy, if possible, [the] criteria specified in statute or regulation is not ascertainable by the court[,]" and consequently cannot be implied in the contract. *Id*. By contrast, in *Stewart* and *Hays*, the process for satisfying the clear title contingencies was in the hands of a third party (a court), but was available to the parties, and a court could imply a reasonable period of time in which the contingency could be satisfied. We concluded that "just as it would be ridiculous to presume that title clearing litigation might take 21 years to complete, it would be ridiculous to presume that it might take [the county authorities] 21 years to act on [the seller's] application for permits." 120 Md. App. at 663 (footnote omitted).

26

We return to the case at bar. As noted, SPS maintains that, when the Declaration was executed and recorded, it was impossible to know whether, once the builder purchased the lots, any lot would be completed and sold within 21 years of a life in being; or, because there is no designated life in being, within 21 years. In other words, because it was possible that the builder would construct the homes on the lots but not a single one of them would be sold before 2022, the Declaration's provision regarding liens against the lots for Water and Sewer Charges violates the rule against perpetuities. And, the trial court erred by reading the Declaration to imply a reasonable period of time in which homes on the lots would be sold to individual owners. This argument is not supported by the case law.

The case at bar has little in common with *Dorado*, or with the other pertinent rule against perpetuities cases for that matter. There is no actual contingency to the vesting of the interest in real property like those at issue in the relevant cases. The development of land into a residential subdivision begins with the purchase of the real property for development and ends with the sales of newly constructed homes to individual purchasers. Those sales simply are the expected last step in the development. Obviously, there would be no point in developing a residential subdivision if it were not reasonable to assume that, when construction is complete, the buyers will come.

In any event, SPS acknowledges that Saddlebrook was in control of the timing of the subdivision process up to the point when the completed homes would be offered for

sale. The trial court read the Declaration to imply that the sales of the newly constructed homes in the Subdivision to individual lot owners would take place within a reasonable period of time and that that reasonable period of time would be less than a life in being plus 21 years, and indeed less than 21 years. The trial court's ruling in this regard was consistent with the law of contracts, which, in the absence of a time for performance in a contract, permits a court to imply a reasonable time for performance, and with the cases discussed above, which hold that when a contingency to the conveyance of an interest in real property can be satisfied by means of a process by which the contingency can be removed, and the parties, or one of them can access that process, a court can imply a reasonable time by which the contingency can be removed. *See Brown*, 120 Md. App. at 663.

Here, the supposed "contingency" is the sale of the finished homes to home buyers, which is what everyone involved in the development of a residential subdivision expects to happen. There is no inaccessible "process" that must be used to satisfy this "contingency." The language used by this Court in *Stewart* and *Brown* is appropriate here: to the extent the sales of homes in the Subdivision is a contingency at all (which it is not), it is ridiculous to think that the homes would not be sold within 21 years of the execution and recording of the Declaration. The lien provision of the Declaration does

28

not violate the rule against perpetuities.[16]

## **II.**

## **Covenant Running With the Land**

SPS contends the Declaration's requirement that lot owners pay Water and Sewer Charges is not a covenant running with the land; therefore, the obligation to pay does not apply to "downstream" purchasers of the lots. And, because the downstream purchasers have no obligation to pay the Water and Sewer Charges, there can be no liens against their properties for those charges.

In *Gallagher v. Bell*, 69 Md. App. 199 (1986), we explained:

> Covenants made by parties to the conveyance of an interest in land may be regarded as being either personal in nature or as running with the land. The difference, as observed in 5 R. Powell, *The Law of Real Property*, § 673[1], p. 60-66, "hinges upon whether the original covenanting parties' respective rights or duties can devolve upon their successors."

*Id*. at 206. For a covenant to run with the land, it must "touch and concern" the land; the original parties to the covenant must have intended that it run with the land; there must be some form of privity of estate; and the covenant must be in writing. *Cnty. Comm'rs of Charles Cty. v. St. Charles Assocs. Ltd. P'ship ("St. Charles")*, 366 Md. 426, 450 (2001); *Mercantile-Safe Deposit & Tr. Co. v. Mayor and City Council of Baltimore*, 308 Md. 627, 632 (1987).

"Whether a covenant touches and concerns the land may be considered in terms of

---

[16] In fact, all 187 homes in the first phase of the Subdivision have been sold.

the burdens or benefits it imposes. Thus, the test is met if the performance of the covenant will 'tend necessarily to enhance [the] value [of the land].'" *Mercantile,* 308 Md. at 633 (quoting *Whalen v. B&O R.R. Co.*, 108 Md. 11, 20 (1908) (alterations in *Mercantile*)). The touch and concern test is in the alternative; that is, it will be satisfied if, upon performance of the covenant, *either* the burden *or* the benefit of the covenant will tend to enhance the value of the land. *Id.*

The benefit or burden of a covenant "will not pass to a successor in interest unless the parties intended that result." *Gallagher*, 69 Md. App. at 212 (footnote omitted). The intention of the parties may be gleaned from the language of the agreement alone or from that language and other indicia of intent. *Bright v. Lake Linganore Ass'n*, 104 Md. App. 394, 418 (1995). However, "a covenant that, by its very terms, runs with the land may not be enforceable if the parties creating the covenant intend that it not run." *Id.* at 421. The presence or absence of language in the parties' agreement that binds successors and assigns is of "'critical effect.'" *St. Charles,* 366 Md. at 448 (quoting *Mercantile*, 308 Md. at 635). A covenant respecting a future obligation may run with the land when "'the performance of the covenant touches and concerns the land within the meaning of the "benefit or burden" standard,'" and the agreement "'expressly binds successors and assigns.'" *Id.* (quoting *Mercantile*, 308 Md. at 636).

Privity of estate can be satisfied by proof of "vertical privity," which "focuses . . . on the devolutional relationships." *Gallagher*, 69 Md. App. at 217. For vertical privity

30

to be satisfied, it only is necessary that "'the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefitted or burdened." *Id.* at 216 (quoting *Powell*, *supra*, § 673[2], 60-64).

SPS argues that, as a matter of law, the obligation to pay Water and Sewer Charges as established by the Declaration is not a covenant running with the land, for three reasons, the first two of which relate to the "touch and concern the land" requirement. It maintains that a covenant "must extend to the land, so that *the thing required to be done* will affect the quality, value or mode of enjoying the estate conveyed," *id.* at 209 (emphasis added); but here, the Declaration *did not require* Saddlebrook or Utility to build the water and sewer facilities or to do anything at all. In other words, there was no burden on Saddlebrook or Utility. Second, even if the Declaration required Saddlebrook or Utility to build the water and sewer facility, or to do or refrain from doing something else respecting the Subdivision property, under *Sanitary Facilities II v. Blum*, 22 Md. App. 90 (1974), the promise by downstream purchasers of lots to pay for the previously constructed facilities does not touch and concern the land, because that does not benefit or burden the use, occupation, or enjoyment of the estate while it is owned by the covenanting parties. Finally, SPS's third argument is that the privity of estate element is not satisfied because Utility, the entity that benefits from the payment of the Water and Sewer Charges by lot owners, is not in vertical privity with any downstream purchaser.

31

There is no merit in any of these arguments.

We disagree that the Declaration did not impose any obligation upon Saddlebrook or Utility to build the water and sewer facilities for the 187 lots. The recitals to the Declaration, which are "incorporated in and made a material part of this Declaration," state that Saddlebrook and Utility "intend to provide the Lots with access to and service from sewer pipes and transmission lines in the streets and/or in the public rights-of-way," and with "house connections" thereto, *i.e.*, "Sewer Facilities"; and "intend to provide the Lots with access to and service from water pipes and transmission lines in the streets and/or the public rights-of-way," and with "house connections" thereto, *i.e.*, "Water Facilities." It is upon Saddlebrook's and Utility's performance of their intended acts—actually constructing the water and sewer facilities—that the promise by each lot owner to pay the annual Water and Sewer Charges comes to fruition.

The Declaration cannot reasonably be read to mean that Saddlebrook and Utility were not undertaking an obligation to construct the water and sewer facilities. Without water and sewer facilities, there could be no residential development at all. This was not a stated intention to build an amenity that was peripheral to the development and not necessary to the development coming into existence. It was a promise to build the water and sewer facilities necessary for the subdivision to be built; and only upon doing so would the lot owners become obligated to pay the annual Water and Sewer Charges. In addition, the evidence included the MOU between Saddlebrook and the WSSC, by which

32

Saddlebrook agreed to build the water and sewer facilities with the WSSC's supervision and approval. And of course that is what Saddlebrook did.

On the second point, *Sanitary Facilities II,* 22 Md. App. at 90*,* is easily distinguishable from the case at bar and illustrates why there is no merit in the first point. In that case, a developer owned several companies through which he did business. One such company, Registered Realty, Inc. ("Registered"), purchased raw land on which to develop a subdivision. Two years later, Registered conveyed it to Sanitary Facilities II, Inc. ("SF"), another such company. SF immediately reconveyed the land to Registered by a "Deed and Agreement" that stated that Registered intended to construct water and sewer facilities for the lots in the subdivision and that it was the purpose of the Deed and Agreement to make a covenant and agreement to pay water and sewer charges (calculated like a front-foot benefit) that would run with the land and be binding upon each lot and the future owners of the lots; and that the annual charge would be a lien on the future lot owners' land. Registered quickly conveyed the land to Babs, Inc. ("Babs"), a third company under the control of the same developer, with a warrant by Babs to install the water and sewer facilities for the subdivision. All these documents were recorded in the land records.

Two years later, Babs entered into a contract with Cosle Contractors ("Cosle") to build the water and sewer facilities for the subdivision. Babs then contracted to sell the land to Windward, a third party having no connection to the developer or to any of his

33

companies. Windward assumed Babs's contractual obligation to Cosle. In the agreement of sale, Babs promised that, at Windward's request made before settlement, Babs would release all obligations of record pertaining to the property, including the obligation of lot owners to pay a water and sewer charge. For reasons not explained, Windward failed to request a release before settlement.

Windward paid Cosle to construct the water and sewer facilities and then conveyed the lots to a builder. Within two weeks, SF filed a "Declaration" in the land records that set forth a schedule for ultimate lot owners to follow to pay the water and sewer charges, which amounted to $28,500 annually for all the lots combined, for a period of 30 years. Of course, neither SF nor the developer, nor any of its related companies, had paid anything toward the cost of constructing the water and sewer facilities, or had any outstanding obligation to pay anything.

Eventually, houses were built on the lots and were sold to the ultimate lot owners. Upon receiving their first bills for the annual water and sewer charge, the lot owners brought suit to clear title to their properties, arguing that the water and sewer charge was a cloud on their title. In the circuit court, they argued successfully that the Declaration was not a covenant running with the land.

This Court affirmed on appeal. We held that the language of the Deed and Agreement, stating that the obligation to pay the water and sewer charge would run with the land, was not a covenant running with the land. "[A] covenant or condition or burden

34

does not attach to land conveyed merely by virtue of the words employed by the conveyancer." 22 Md. App. at 102-03 (citing *Glenn v. Canby*, 24 Md. 127, 130 (1886)). Rather, there must be a burden or benefit that touches and concerns the land and passes with the ownership of the land. "'Ordinarily . . . a covenant is regarded as touching and concerning the land if it is of value to the covenantee by reason of his occupation of the land or by reason of an easement which he has in the land, or if it is a burden on the covenantor by reason of his occupation of the land.'" *Id*. (quoting Tiffany, *Real Property* (3rd ed.) § 854, at 455).

Registered held the land in fee simple, and "[n]othing it or [SF were] required to do, or refrain from doing, by the Deed and Agreement either benefitted or burdened its use, occupation, or enjoyment of the estate except collaterally, by virtue of its contractual obligation to subject *subsequent* grantees to the charges." *Id*. at 103 (emphasis in original) (footnote omitted). "It would be difficult to conceive of a covenant more 'personal' in nature and therefore less capable of 'running with and binding the land' than this agreement by Registered to do nothing with respect to the use or enjoyment of the property but only to establish facilities charges affecting remote grantees." *Id*. at 104.

In the case at bar, Saddlebrook and Utility, unlike Registered and SF, entered into a contract for construction of the water and sewer facilities in the Subdivision. Wilson built the water and sewer facilities, and Saddlebrook and Utility paid it to do so. This case resembles *Chesapeake Ranch Club, Inc. v. C.R.C. United Members, Inc.*, 60 Md.

App. 609 (1984), in which we held that a covenant by purchasers of lots in a subdivision to pay for the construction, maintenance, and repair of streets in the subdivision was a covenant that touched and concerned the land, and ran with the land. In that case we said:

> "The test whether a covenant will or will not run with the land depends not so much on whether it is to be performed on the land itself as on whether it tends directly or necessarily to enhance its value or render it more beneficial or convenient to those by whom it is owned or occupied. Those covenants that are generally held to run with the land and to insure to the benefit of the assignee are such as ordinarily affect the land itself and confer a benefit on the grantor."

*Id*. at 616 (quoting 20 Am. Jur. 2d *Covenants* § 35 (1965 Cum. Supp. 1983) (footnotes omitted). *See also Wehr v. Roland Park Co.*, 143 Md. 384 (1923) (holding that covenant to pay annual fee for maintenance of services relating to land touch and concern the land).

To be sure, in this case, Saddlebrook and Utility did not agree to make ongoing repairs to the Water and Sewer Facilities. We do not think that makes a difference. They undertook to install the facilities, to the benefit of the land, as without the facilities the lots would not be able to be used for residences; and that benefit continued beyond the time the facilities originally were installed.

Finally, SPS's argument that Saddlebrook and Utility were not in vertical privity with the lot owners hearkens back to its argument that they had no obligation to install the Water and Sewer Facilities under the terms of the Declaration, and thus they were not

36

"burdened." In fact, they were obligated to install the facilities, and they performed on that obligation; and the benefit of that performance will be enjoyed not only by the original lot owners but by their successors. As noted, there is vertical privity when "'the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefitted or burdened.'" *Gallagher v. Bell*, 69 Md. App. at 216 (quoting Powell, *supra*, § 673[2], at 60-64). That relationship exists here.

SPS tacitly concedes that the Declaration expresses the intention that the obligation to pay the Water and Sewer Charges will be a covenant running with the land. In other words, not only does the Declaration state that it is a covenant running with the land, it was the intention that it be a covenant running with the land. Also, the Declaration contains language that expressly binds "successors and assigns," which is "'strong evidence of the devolutive intent' of the parties." *St. Charles*, at 452 (quoting *Mercantile*, 308 Md. at 627, 638). The Declaration satisfies the four criteria necessary to be a covenant running with the land. Therefore, it is binding not only on the original lot owners, but on their downstream purchasers.

## III.

### Recordation and Transfer Taxes

SPS contends the trial court erred in granting Saddlebrook and Utility's motion for judgment on its claim that, if a lien were created by the Declaration and the Declaration is a lien instrument, it cannot be enforced because recordation and transfer

taxes that must be paid for a lien instrument to be recorded were not paid. SPS maintains that Saddlebrook and/or Utility were obligated to pay a County Transfer Tax at a rate of 1.4% of the debt secured and a State Recordation Tax at a rate of $2.75 per $500 in debt secured.[17,18] SPS calculated the unpaid County tax to be $42,149.82 and the unpaid State tax to be $16,557.75.[19] According to SPS, the failure to pay recordation and transfer taxes deprives the Declaration of any status it might otherwise have had as a recorded lien instrument, making it ineffective to put SPS (or any other subsequent lienholder) on constructive notice of its existence.

Saddlebrook and Utility respond that SPS lacks standing to assert a violation of the recording statutes. They maintain that because any violation of those statutes would be a "public wrong," SPS must show that it suffered special damages different in character and kind from that suffered by the general public in order to seek redress. Because SPS did not meet this burden or show that there is a private cause of action for enforcement of the recording statutes, the trial court did not err by granting summary judgment on this claim.

---

[17] *See* PGCC, §§10-187 – 10-188.

[18] *See* Md. Code (1985, 2012 Repl. Vol.), §§ 12-103 & 13-402.1 of the Tax-Property Article ("T-P").

[19] SPS arrived at these amounts by multiplying the amount of the annual water and sewer charge ($700) by the number of lots (187), for a total debt of $3,010,700 secured by the Declaration. It applied the County and State assessment rates to this figure to calculate the total tax.

In its reply brief in this Court, SPS concedes that it must show special damages in order to redress an alleged violation of the recording statutes, but argues it has satisfied that burden. It asserts that if Saddlebrook and Utility are "granted the benefits of a recorded lien without payment of the excise tax for said benefit," it will suffer special damage because the DOT will be "junior and subordinate" to the lien created by the Declaration.

The trial court ruled that the "failure to pay [County and state recordation and transfer taxes] was not due to the fault, refusal, or negligence of [Saddlebrook or Utility]." Rather, no taxes were requested and any "mistake . . . was the [C]ounty's mistake" and could not be chargeable to Saddlebrook or Utility. The court reasoned that the result may have been different had Saddlebrook or Utility been invoiced for taxes and failed to pay them.

We perceive no error in the court's ruling. An "allegedly unlawful action[] of the government" that affects all members of the public equally is a "public wrong." *State Center LLC v. Lexington Charles Ltd. P'Ship.*, 438 Md. 451, 518 (2014). The failure to collect transfer or recordation taxes is this type of wrong because the direct harm it causes - a loss of tax revenue - falls equally on all citizens. "In situations where the complainant is seeking to redress a public wrong, he has no standing in court unless he has also suffered some special damage from such wrong differing in character and kind from that suffered by the general public." *Weinberg v. Kracke*, 189 Md. 275, 280 (1947);

39

*accord 120 W. Fayette St., LLLP v. Mayor & City Council of Baltimore*, 407 Md. 253, 270 (2009).

In the case at bar, the court made a non-clearly erroneous finding that the Clerk did not charge Saddlebrook or Utility any recordation or transfer taxes at the time the Declaration was filed. SPS did not suffer any special damage arising from the Clerk's failure to impose these taxes. The subordination of the DOT to a lien created by the Declaration arose not from the failure to pay taxes, but from the recordation of that instrument in the Land Records prior to the recordation of the DOT. Thus, SPS lacks standing to assert a claim arising from the violation of the recording statutes.

**IV.**

**<u>Lien Creation, Enforcement, and Priority</u>**

As explained, the trial court found that the Declaration created a lien against the Property securing payment of the annual Water and Sewer Charges; that the lien took effect on April 1, 2002, the date that Mr. Bradley took title to the Property; and that the lien had priority over SPS's later recorded DOT. By implication, the trial court rejected SPS's argument that a lien for payment of the annual Water and Sewer Charges only could be created and enforced under the MCLA.

Whether the Declaration created a lien against the Property and, if so, whether that lien has priority over SPS's DOT is a complex legal question that concerns the statutory obligation of owners and developers in the sanitary district to pay for water and sewer

facilities, the law of priority of liens against real property, interpretation of the language of the Declaration, the rights of lienholders to force a sale of property, and the application, if at all, of the MCLA. To the extent the trial court made factual findings to support its legal conclusion that the Declaration created a lien against the Property that is superior to SPS's DOT, we accept those findings unless they are clearly erroneous. *See* Md. Rule 8-131(c). We decide the relevant legal issues *de novo*. *E.g.*, *L.W. Wolfe Enters. v. Md. Nat'l Golf, L.P.*, 165 Md. App. 339, 344 (2005).

**(a)**

The genesis of the lien creation and priority dispute in this case is a 1999 amendment to the statute governing the WSSC. The WSSC "operates the public water supply, sewage collection and treatment, and storm water management systems in most of Prince George's and Montgomery counties." *WSSC v. Lafarge N. Am., Inc.*, 443 Md. 265, 269 (2015). Ever since the sanitary district was established in the early 1900s, one of the WSSC's functions has been to construct water mains and sewers that "the Legislature has 'declared to be a benefit to all property abutting the same.'" *Manor Real Estate Co. v. Jos. M. Zamoiski, Co.*, 251 Md. 120, 130 (1968) (quoting PGCC § 83-71(a) (1963)). The water and sewer facility construction is funded by the sale of bonds, and, as permitted by the General Assembly, the WSSC then raises money to retire the bonds by "'fix[ing] and levy[ing] a benefit charge upon all abutting property.'" *Id*. (quoting PGCC § 83-71(a)). The benefit charge is to "'be paid annually, beginning from the time of the

levy thereof, by all properties, . . . for a period of years coextensive with the period of maturity of the bonds out of the proceeds of which such construction (or acquisition) was done.'" *Id*. (quoting PGCC § 83-71(f)). *See also WSSC v. Noel*, 155 Md. 427**,** 435 (1928) (stating that the legislature may "require the entire cost of an installation of improvement to be defrayed by front-foot assessments on properties within a specially benefitted district").

Md. Code (1998, 2010 Repl. Vol.), section 25-204 of the Public Utilities Article ("PU"), in which the WSSC's "Benefit charges" authority presently is codified, requires that, once the benefit is afforded, the property owner must pay the benefit charge to the WSSC "annually for a period of years equal to the period of maturity of the bonds the proceeds of which financed the construction of the water main or sewer." PU § 25-204(d)(1). "Each benefit charge imposed under this subtitle is a lien against the property that continues until the benefit charge is paid and the account is extinguished in accordance with this subtitle." PU § 25-204(e).

Even though front-foot benefit charges are not a tax, *see Chevy Chase Bank, FSB v. Chaires*, 350 Md. 716, 731 (1998), they are treated as county taxes for purposes of collection, *see Manor Real Estate*, 251 Md. at 131, and the failure to pay when due subjects the property to being sold at tax sale. *See* PU § 25-214(c)(5) (providing that a property that is "subject to a delinquent benefit charge shall be sold for the delinquent benefit charge at the same time and in the same manner as property sold for delinquent

42

county taxes"). Like unpaid taxes on real property, a delinquent benefit charge on real property is a lien on the property from the date it becomes payable until the date it is paid and is a first lien. *See* T-P § 14-804(a); T-P § 14-805(a); *In re Reamy*, 169 Bankr. 352, 353 (Bankr. D. Md. 1994) (In Maryland, property taxes only become a lien against the property of the owner when they are due *and* unpaid.). If the benefit charge remains unpaid, the property is put up for sale by the tax collector. T-P § 14-808. The property owner or any other person with an estate or interest in the property may redeem it, T-P § 14-827; and any suit to foreclose the right of redemption must include any mortgagee or trustee under a deed of trust. T-P §14-836. Notice of the right to redeem must be given to the current mortgagee or its assignee or servicer or to the current holder of a beneficial interest in a deed of trust. If the property is not redeemed, the statutory first lien for real estate property taxes takes priority over all other liens on the property in favor of private parties, regardless of whether those liens were recorded before or after the first priority lien for real estate taxes. *Edmondson v. Chesapeake Clamchip Corp.*, 350 F. Supp. 1236, 1238 (D. Md. 1972).

Likely because the tax sale process is clear cut, and the right to redeem may be exercised by a mortgagee or deed of trust beneficiary to avoid possible negative ramifications for its interest of not redeeming the property, there are no Maryland lien priority cases involving front-foot benefit charges. The only cases that concern front-foot benefit charge liens involve disputes between property owners and title companies over

43

the extent to which an obligation to pay front-foot benefit charges is a lien or an encumbrance. *See, e.g., Strass v. District-Realty Title Ins. Corp.*, 31 Md. App. 690 (1976).

The change in the law that concerns us is the statutory amendment that since 1999 has required owners or developers of construction projects for two or more residences in the sanitary district to build the water and sewer facilities in their planned subdivisions themselves, at their own expense. *See* PU § 23-201(c). Before undertaking construction, an owner or developer must enter into an agreement with the WSSC by which the WSSC approves the plans and specifications and supervises the construction, and the owner or developer must provide the WSSC performance security and releases of liens held by contractors, subcontractors, and suppliers. *Id.* at (d). The statute as amended does not include a provision by which the owners or developers may recoup their costs. One way for them to do so is to pass the costs of building water and sewer facilities on to a builder to whom the lots are sold (or, if the lots are sold directly to the ultimate purchasers, to incorporate the costs in the sales prices of the homes). Saddlebrook did not pass its costs on to Maryland Homes. Instead, it sought to obtain repayment by contract (through the Declaration) with the ultimate home purchasers, over a period of years.

**(b)**

As in most jurisdictions, in Maryland a deed or "other instrument" that is first recorded in the land records takes priority over later recorded instruments, except as

against a *bona fide* purchaser for value without notice.  RP § 3-203.  So, when there is more than one lien against the same property, "lien priority is usually determined by recording date: lienholders with earlier-recorded liens have priority over lienholders with later-recorded liens."  *Glen Burnie Mut. Savings Bank v. U.S.*, 733 F. Supp. 2d 623, 625 (D. Md. 2010).  There are exceptions to this general rule for tax liens and other liens securing government fees*, see* Md. Code (1988, 2010 Repl. Vol., 2015 Supp.), section 13-809(a) of the Tax General Article (providing that a tax lien "shall be first paid and satisfied from the proceeds of a sale of any property of a person liable for the tax"), and for purchase money mortgages or deeds of trust.  *See* RP § 7-104 (providing that those lien instruments take priority over earlier recorded liens).  *See also Glen Burnie Mut. Savings Bank*, 733 F. Supp. 2d at 625.  At the relevant time in this case, refinance mortgages and deeds of trust did not have such priority.[20]

As discussed above, the trial court ruled that the Declaration created a lien and that the lien it created had priority over SPS's DOT.[21]  On review, we first must decide

---

[20] In 2013, the Real Property Article was amended to extend the same priority to refinance mortgages and deeds of trust that meet certain requirements.  2013 Md. Laws, Ch. 205.  The General Assembly stated its intention that the amendment only would apply prospectively to refinance mortgages recorded after the effective date of the law. *Id*.

[21] In its ruling, the trial court described the lien created by the Declaration as a "super lien."  In context, we take that as part of the court's ruling that the lien created by the Declaration had priority over later filed liens.  A "super lien" is a term of art in real estate law.  Ordinarily, a "super lien" is a lien in favor of a homeowners' association or

(Continued…)

(…continued)

condominium association that, by statute, is given "limited senior priority" over prior-recorded first mortgage liens. *See* Wells, Grahame K., *The Use of Super-Liens to Promote Cooperation Between Condominium Associations and Lenders*, 13 Ann. Rev. Banking L. 477, 478 (1994) ("*Wells*"). As explained by *Wells* with respect to condominium association assessments, the purpose of super lien statutes is to allow a condominium association to receive some portion of assessments owed to it when, upon foreclosure of a first lien on the unit, there would be no funds for the condominium association to receive:

> Most state laws have given the condo association a lien on the condominium unit for delinquent condo fees. Yet, state laws generally subordinate the condo association's lien to the first mortgagee's lien. In most foreclosure sales, the lender is unable to generate sufficient funds to satisfy the first mortgage. Nevertheless, the foreclosure extinguishes junior liens, including the condo association's lien. Thus, many *condo associations never recover the delinquent condo fees.*
>
> *The financial plight of many condo associations prompted calls to strengthen the associations' power to collect delinquent assessments. Many states responded by enacting legislation, commonly referred to as a super-lien statute, that elevates the condo association lien to a limited senior priority over the first mortgage. States employ the limited priority lien to encourage the first mortgagee to take a greater role in ensuring that unit owners pay their condo fees. In addition, the limited priority lien augments the condo association's ability to recover delinquent condo fees from the proceeds of the first mortgagee's foreclosure sale.*

*Wells*, at 478 (footnotes omitted).

In fact, although they do not make express reference to "super liens," both the Maryland Condominium Act and the Maryland Homeowners Association Act create super liens. Under the Condominium Act, when a unit owner fails to pay an assessment, the condominium association may enforce the obligation to pay by a lien obtained under the MCLA. RP § 11-110(d). As explained *infra*, such a lien is effective as of the date of recording of the statement of lien, which almost always will be after the first mortgage or deed of trust was recorded, and therefore does not have priority. However, under the super lien provision of the Condominium Act, in the event the mortgagee or deed of trust beneficiary brings suit to foreclose against the unit, a portion of the condominium association's MCLA lien on the unit, equal to 4 months of unpaid regular assessments, not exceeding $1,200, shall have priority over the first mortgage or deed of trust. RP §

(Continued…)

46

whether the Declaration in fact created a lien, as Saddlebrook maintains, or whether it merely created a right to obtain a lien under the MCLA, as SPS maintains. Before doing so, we briefly review the MCLA.

A "contract" within the meaning of the MCLA is "a real covenant running with the land or a contract recorded among the land records of a county or Baltimore City." RP § 14-201(b)(1). The MCLA separately addresses liens that are created by contracts and liens that are created by a breach of contract. RP section 14-202 concerns the former. It provides that "[a] lien on property may be created by a contract and enforced under [the MCLA] if: (1) The contract expressly provides for the creation of a lien; and (2) The contract expressly describes (i) The party entitled to establish and enforce the lien and (ii) The property against which the lien may be imposed." RP § 14-202(a). Such a lien "may only secure the payment of: (1) Damages; (2) Costs of collection; (3) Late charges permitted by law; and (4) Attorney's fees provided for in a contract or awarded by a court for breach of a contract." RP § 14-202(b). "'Damages' means unpaid sums due under a contract, plus interest accruing on the unpaid sums due under a contract or as provided by law . . . ." RP § 14-201(c)(1).

RP section 14-203 addresses liens that may be created as the result of a breach of

---

(…continued)
11-110(f). *See also* RP § 11B-117(c) (creating an identical super lien for a portion of unpaid HOA assessments).

47

contract. A party seeking to create such a lien may do so if, within two years of the breach, he or she gives written notice, as specified, to the party against whose property the lien is to be imposed. RP § 14-203(a) & (b). A party to whom notice has been given may file a complaint to determine whether probable cause exists to establish a lien. *Id.* at (c). In that proceeding, the party seeking to establish the lien bears the burden of proof. *Id.* at (d). If the court finds that there is probable cause to establish a lien under the MCLA, it "shall order the lien imposed." *Id.* at (g). (The court also shall order the lien imposed if no timely complaint is filed. *Id.* at (h)(2)(ii)). The party who sought the lien then may record a "statement of lien" in the land records of the county where the property is located. *Id.* at (h).[22] "A lien imposed under [the MCLA] has priority from the date the statement of lien is filed." *Id.* at (h)(4).

With certain exceptions pertaining to liens against units or lots governed by

_____

[22] The MCLA includes a standard form Statement of Lien. As relevant, it reads

STATEMENT OF LIEN

This is to certify that the property described as _____ is subject to a lien under [the MCLA], in the amount of $____. The property is owned by _____.

I hereby affirm under the penalty of perjury that notice was given under [RP] § 14-203(a) . . . , and that the information contained in the foregoing statement of lien is true and correct to the best of my knowledge, information, and belief.

RP § 14-203(j)(1).

48

condominium or homeowners associations, the MCLA provides at RP section 14-204(a) that "a lien may be enforced and foreclosed by the party who obtained the lien in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deeds of trust on property in this State containing a power of sale or an assent to a decree." Presently, an action to foreclose under the MCLA must be brought "within 12 years following recordation of the statement of lien." *Id*. at (c). At the pertinent time in this case, that period was three years. [23]

We return to the question whether the Declaration created a lien against the Property or created a right to obtain a lien against the Property. SPS asserts that the language of the Declaration did not create a lien. It argues that it created a right to obtain a lien, and in that case the MCLA provides the sole process by which the lien may be created and imposed. Saddlebrook and Utility assert that a lien may be created by contract and that the Declaration is a contract that by its plain language created a lien against the Property.

Whether the Declaration created a lien or created a right to obtain a lien is a question of contract interpretation, which we decide as a matter of law. *United Servs. Auto Ass'n v. Riley*, 393 Md. 55, 79 (2006). Maryland adheres to the objective law of contracts, under which the plain language of a contract controls its meaning. *Cochran v.*

---

[23] As previously noted, the amendment to the MCLA increasing the time limit from three years to 12 years was enacted effective October 1, 2008.

49

*Norkunas*, 398 Md. 1, 16 (2007). Only when the language of a contract is ambiguous, so that its meaning cannot be ascertained from the words themselves, will extrinsic evidence be used to determine the contract's meaning. *Point's Reach Condo. v. Point Homeowners Ass'n, Inc.*, 213 Md. App. 222, 255 (2013). Whether a contract is ambiguous is a question of law. *Towson Univ. v. Conte*, 384 Md. 68, 78 (2004). A contract is ambiguous when its language can be read to have two reasonable but inconsistent meanings. *Calomiris v. Woods*, 353 Md. 425, 435-36 (1999).

"'The modern conception of a lien is that it is a right given by contract, statute or rule of law to have *a debt or charge* satisfied out of a particular property.'" *Chaires*, 350 Md. at 731 (quoting 3 Am. Law of Property § 1320, at 537 n.4 (A.J. Casner ed. 1952)) (emphasis added). *See also Montgomery Cnty. v. May Dept. Stores Co.*, 352 Md. 183, 195 (1998) (a lien is a security interest in property; it is a charge upon a particular property for the payment of a particular debt or duty).[24] Although there are no Maryland cases on point, cases from other jurisdictions have addressed whether the language in a recorded declaration of covenants that requires payments of assessments by lot owners in a community created a lien, or created a right to obtain a lien. The outcome in those cases turns on whether the language of the declaration creates a continuing lien against the property for the assessment charges or creates the right to a lien upon nonpayment of

---

[24] There are liens created by the common law as well, but they pertain to personal property.

50

the assessment charges.

*Bessemer v. Gersten*, 381 So. 2d 1344 (Fla. 1980), was a lien priority dispute between the developer of a residential subdivision and the owners of one of the lots in the subdivision. Before completing construction of the subdivision, the developer recorded a declaration imposing upon each lot owner the obligation to pay a monthly assessment of $10.00 to finance a recreational facility the developer would build for the benefit of the subdivision residents. Under the terms of the declaration, the obligation to pay the monthly assessment would commence in the month following the developer's recordation of a certificate of completion of the facility, and "*each [lot] owner hereby agrees that [the developer], its successors or assigns, shall have a lien upon such owner's lot for the aforesaid amount of $10.00 per month until such amount is paid.*" *Id*. at 1346 (emphasis added). The declaration further provided that "such lien, where the same remains unpaid for a period of thirty days or more, may be foreclosed in equity in the same manner as is provided for the foreclosure of mortgages upon real property." *Id*. at 1346.

Several months after the declaration was recorded in the land records, the lot owners purchased their lot. Five years later, they failed to pay their monthly assessment. The developer brought suit to foreclose on its lien under the declaration. The lot owners did not dispute that they owed the delinquent assessment, but argued that the lien did not come into existence until they defaulted on the assessment, and because that did not happen until after they purchased their lot, their homestead rights, which by law protected

51

them and arose upon their purchase of the property, had priority over the developer's lien.

The Supreme Court of Florida focused its decision on the plain language of the declaration. It held that by accepting the deed to their lot with actual or constructive notice of that language, the plaintiffs "manifested the intent to let the real property stand as security for the [assessment] obligation." *Id*. at 1348. The declaration created a lien, by contract, when the lot owners took title to their property; the lien continued so long as their obligation to pay the monthly assessment existed; and the lien related back in time to the date of the recording of the declaration. "Thus, with regard to the time of attachment of the lien, this case is to be treated as if the [lot owners] had taken title subject to a valid pre-existing lien." *Id.* The lot owners' homestead rights arose when they purchased the property, but, because the lien attached before then, the lien took precedence. Accordingly, the developer was entitled to foreclose on its lien. *See also Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635-36 (Tex. 1987) (language of declaration recorded by developer of subdivision placing "charge" against each lot for assessments and stating that the charge would be secured by a continuing lien against the lot created a lien that related back to the date of recording of the declaration, taking precedence over lot owner's homestead rights).

A continuing lien created as security for payment of an ongoing charge against property, in the form of an assessment, differs from a lien that can be created upon "nonpayment" of such an assessment. In *Holly Lake Ass'n v. Fed. Nat'l Mortg. Ass'n*,

52

660 So. 2d 266 (Fla. 1995), the Supreme Court of Florida distinguished its *Bessemer* decision. In 1974, a homeowners association for a mobile home park recorded a declaration that obligated each unit owner to pay a monthly assessment. The declaration stated, "In the event the monthly [assessment] is not paid when due, [the homeowners association] shall have the right to a lien against [the mobile home site] . . . and shall have the right to enforce said lien." *Id*. at 267. In 1983, a mortgagee recorded a mortgage granted to purchasers of a unit in the mobile home park. Eight years later, in 1991, the home site owners failed to pay both their monthly assessment and their mortgage. The homeowners association recorded a claim of lien in the land records. Soon thereafter, the mortgagee brought a foreclosure action. The homeowners association filed a counterclaim, asserting that its lien for unpaid monthly assessments related back to 1974, when the declaration was recorded, and therefore was superior to the mortgagee's lien. The mortgagee replied that its 1983 lien was superior, because the homeowners association did not obtain its lien until 1991, and there was no language in the declaration stating that the lien would relate back in time to the date the declaration was recorded.

The Supreme Court of Florida agreed with the mortgagee. It read the operative language of the declaration as "merely grant[ing] the [homeowners association] the right to file a lien in the event of nonpayment." *Id.* at 268. By contrast, the language in the declaration in *Bessemer* "put all parties on notice that an ongoing, automatic lien had been created at the time that the property was purchased, and that this lien would

53

continue each month until the owner paid the monthly assessment fee." *Id.* The court made clear, moreover, that for a declaration "to have priority over an intervening recorded mortgage, the declaration must contain specific language indicating that the lien relates back to the date of the filing of the declaration or that it otherwise takes priority over intervening mortgages." *Id.* at 269. *See also Bd. of Dirs. of Olde Salem Homeowners' Ass'n v. Sec'y of Veterans Affairs*, 589 N.E.2d 761 (Ill. App. Ct. 1992) (holding that when declaration imposed assessments and gave the homeowners association a continuing lien against lots for unpaid assessments, a lien did not exist when the declaration was recorded and only arose upon nonpayment); *St. Paul Fed. Bank for Sav. v. Wesby*, 501 N.E.2d 707, 711, 713 (Ill. App. Ct. 1986) (holding that language of declaration imposing assessments and providing that the amount of unpaid assessments constitutes a lien on the property "*when due*" is "merely a notice that a right to perfect a lien existed") (emphasis added).

We return to the language of the Declaration in this case. In Paragraph 2, "Establishment of Lien and Personal Obligation," each lot owner agrees to pay the Water and Sewer Charges assessed against his lot for as long as he is the owner in fee simple and "grants to [Utility] a lien to secure payment of the aforesaid Water and Sewer Charges upon the Lot against which the aforesaid Water and Sewer Charges are assessed." This language is not ambiguous. As in *Bessemer*, it creates a lien against each lot that secures payment of the Water and Sewer Charges for that lot, until they are fully

54

paid. It does not create a right to obtain a lien that arises when Water and Sewer Charges are unpaid. Indeed, default is required only for Utility to exercise the power of sale or assent to decree of sale that each lot owner also grants in that paragraph.

We agree with Saddlebrook and Utility that the Declaration created a lien against the Property and that it is a lien instrument. Chapter 200 of Title 14 ("Sales of Property") of the Rules defines a "[l]ien" to mean "a statutory lien or a lien upon property created or authorized to be created by a lien instrument." Md. Rule 14-202(h). A "[l]ien instrument means any instrument creating or authorizing the creation of a lien on property, including: . . . (4) *a contract creating a lien pursuant to [the MCLA.]*" Md. Rule 14-202(i) (emphasis added). [25] Accordingly, Saddlebrook and Utility did not have to invoke

[25] Saddlebrook and Utility also argue that the Declaration created a lien because it is modeled on provisions of the Anne Arundel County Code ("AACC") and the Baltimore County Code ("BCC") that describe developers of residential property that construct water and sewer facilities and impose water and sewer assessments to recoup the cost of those improvements as "lienholders." We disagree with this argument.

The AACC permits Anne Arundel County to enter into agreements with developers by which the developers may "recoup from a subsequent user, directly or through the County, the actual cost of any improvements to the County's water or wastewater system constructed or paid for by the developer that are over and above those improvements otherwise required by [the AACC]." AACC § 13-5-110(a). If a developer enters into such an agreement and charges downstream residential owners "a fee or assessment that purports to cover or defray all or part of the cost of installing or maintaining all or any part of the public water or wastewater facilities," the developer must provide notice of the fee in the contract of sale, bill the property owner annually, permit prepayment without penalty and at a discount, and notify the property owner if the right to collect the fee is assigned. AACC § 13-5-111(a). Failure to comply with the notice provisions renders any obligation to pay the assessment void and unenforceable. AACC § 13-5-111(b). A form "Notice" to a purchaser states:

(Continued…)

the MCLA to *create* a lien against the Property when Mr. Bradley failed to pay the annual Water and Sewer Charges. The lien already was in existence.

As noted above, SPS maintains that notwithstanding the language of the Declaration, the MCLA is the only permitted means for imposing a lien on real property by means of a contract. It relies upon *Chesapeake Ranch Club v. Garczynski*, 71 Md. App. 224 (1987), and *Bright,* 104 Md. App. at 394. Neither case supports SPS's argument.

In *Chesapeake Ranch Club*, the developer of a residential community recorded a declaration that required lot owners to pay a yearly assessment and fees. When the owners of a lot defaulted on those payments, the developer brought suit to impose a lien

(…continued)

> This property is subject to a fee or assessment which purports to cover or defray the cost of installing or maintaining all or part of the public water or wastewater facilities constructed by the developer of the subdivision. This fee or assessment is (amount) payable annually in (month) to (name and address) (hereinafter called 'lienholder') until (date). There may be a right of prepayment or discount for early payment which may be ascertained by contacting the lienholder. *This fee or assessment is a contractual obligation between the lienholder* and each owner of this property and is not in any way a fee or assessment by Anne Arundel County.

AACC § 13-5-111(c) (emphasis added). Failure to include in the sales contract a notice provision that is "substantially" the same as the form notice is ground for the purchaser to rescind prior to settlement without penalty and, after settlement, subjects the seller to liability in the amount of "any open lien or assessment." AACC § 13-5-111(d). The BCC provisions are modeled after the AACC. *See* BCC §§ 32-4-310 & 32-4-311.

There is no language in these local ordinances creating a lien, or even creating the right to obtain a lien.

under the MCLA. The trial court denied relief on the ground that the MCLA only applied to condominium units. This Court reversed. We held that the definition of "contract" in the MCLA is not restricted to declarations or bylaws recorded under the Maryland Condominium Act, and therefore the MCLA "applies to property other than and in addition to condominium units." *Id*. at 225. The case did not concern a lien created by a declaration and there is no reference to there being any lien language in the declaration at all.

In *Bright*, a homeowners association brought suit against several lot owners who failed to pay an annual assessment required by a declaration of covenants included in key deeds, seeking to impose liens against their properties under the MCLA. The declaration provided that the "assessments 'shall be and remain a first lien upon each lot' and '[i]f the assessment is not paid . . . the [homeowners association] may bring an action at law . . . to foreclose the lien against the property. . . .'" *Id*. at 436 (quoting declarations) (alteration in *Bright*). The trial court imposed liens against the lots for which assessments had not been paid, under the MCLA, and the lot owners appealed. Their primary argument with respect to the liens imposed was that they had no underlying obligation to pay the assessments, and therefore the MCLA did not apply. Quoting *Chesapeake Ranch Club*, 71 Md. App. at 229, we held that the MCLA was "'applicable to the lien attempted to be imposed by the [homeowners association] on the land of the [lot owners].'" *Id*. at 437. The homeowners association did not argue that the declaration of covenants itself created

a lien, and, as noted, *it* invoked the MCLA.

SPS contends, alternatively, that even if the Declaration created a lien, the lien only could be enforced against the Property pursuant to the MCLA. In effect, SPS takes the position that to the extent a lien against real property can be created by a real covenant running with the land or a contract recorded among the land records, enactment of the MCLA preempted any means to enforce the lien other than as provided in the MCLA. Saddlebrook and Utility maintain that the MCLA had no such effect; its enforcement process was one remedy available to them, but not the sole remedy. They assert that they were free to seek relief in any manner allowed by the Declaration, which included exercising the power of sale to foreclose on the lien.

This contention by SPS is inconsistent with the plain language of the MCLA and Title 14, Chapter 200 of the Rules, governing the foreclosure of lien instruments. As noted above, the MCLA addresses two separate scenarios: 1) the creation of a lien by contract, *i.e.*, by a real covenant running with the land or a contract recorded in the land records (RP section 14-202); and 2) the creation of a lien as a result of a breach of contract (RP section 14-203). The former section describes the circumstances that must exist for a lien to be created by a contract, and what the lien may secure. It does not set forth any procedure for establishing the lien (as it is an already established lien) or for enforcing it.

The latter section contains detailed procedures that must be followed to create a

lien as a result of a breach of contract, including written notice to the party against whose property the lien is to be imposed and the opportunity for that party to file a complaint in opposition to the creation of a lien and for a hearing. It provides that, if the lien is contested, the party seeking it bears the burden to prove facts showing probable cause to impose the lien; the court makes the probable cause determination; and if the court finds probable cause, it shall issue an order to impose the lien. In that circumstance, the section directs the party seeking the lien to file a statement of lien in the land records, within a set period of time; recites the form of the statement of lien; and provides a means to release the lien.

Pursuant to section 14-204, the lien "may be enforced and foreclosed by the party who obtained the lien in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deed of trust on property in this State containing a power of sale or an assent to a decree." RP § 14-204(a). It is clear that this enforcement provision applies only to liens obtained under section 14-203, as a result of a breach of contract, because the time limit to bring an action to foreclose as permitted by subsection (a) of section 14-204 is "within 12 years following the recordation of the *statement of lien*." RP § 14-204(c) (emphasis added).[26] There is no statement of lien when the lien is created by a contract, as opposed to by a breach of contract. There is no express statutory language

---

[26] As noted, that time limit used to be 3 years.

59

requiring that a lien created by contract only may be enforced under the MCLA, and the language above does not support that notion, and indeed undermines it.

As discussed above, the foreclosure of lien instrument rules include within the definition of "lien instrument" "a *contract creating a lien* pursuant to [the MCLA.]" Md. Rule 14-202(i) (emphasis added). The rules permit an action to foreclose such a lien to be filed if the lien instrument has been recorded and there has been a default that lawfully allows a sale. Md. Rule 14-205(a). The foreclosure action may be instituted by "any individual authorized to exercise a power of sale" or by a secured party under an assent to a decree. Md. Rule 14-204(a)(1) and (2). Thus, under these rules, a holder of a lien against real property created by contract, as described in section 14-202 of the MCLA, and containing a power of sale or assent to a decree, may foreclose on the lien in the event of a default, in accordance with procedures governing the foreclosure of lien instruments as set forth in Title 14, Chapter 200 of the Rules.[27] If a lien against real property created by a contract only could be enforced by recording a statement of lien and invoking the enforcement procedures in section 14-203 of the MCLA, the provisions of the foreclosure of lien instrument rules that make a lien created by contract under the MCLA a lien instrument and allow for the lien's foreclosure by exercise of a power of

---

[27] Rule 14-208 also allows for proceedings to foreclose a lien in accordance with the rules for civil cases in the event there is no power or sale or assent to decree in the lien instrument.

sale or assent to a decree in the lien under those rules would have no purpose. We will not interpret a statute or rule in such a way as to render it of no effect. *See Fisher v. E. Corr. Inst.*, 425 Md. 699, 707 (2012) (in interpreting a statute, a court should be "guided by the presumption that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, such that no part of the statute is rendered meaningless or nugatory") (citation omitted).[28]

The Declaration in this case is a lien created by a contract, as defined by the MCLA. It also is a lien instrument containing a power of sale and assent to a decree that, upon nonpayment of the Water and Sewer Charges by a lot owner, can be foreclosed under the rules governing foreclosure of lien instruments. Saddlebrook and Utility were not required to obtain a lien under the MCLA, to file a statement of lien, or to enforce

---

[28] Virtually every Maryland appellate opinion addressing the MCLA concerns liens obtained as a result of a breach of contract, under RP section 14-203, to which the statement of lien procedure and the enforcement procedure under RP section 14-203 applies. This is not surprising, because the cases largely concern nonpayment of assessments owed by unit owners or homeowners to condominium or homeowners associations. Those entities are creatures of statute, and the statutes controlling them state that payment of assessments, with interest, late charges, costs of collection, if any, and reasonable attorneys' fees may be enforced in accordance with the MCLA. RP § 11-110(d) (Maryland Condominium Act); RP § 11B-117(b) (Maryland Homeowners Association Act). The MCLA, 1985 Md. Laws, Ch. 736, § 1, was enacted in part for the purpose of repealing provisions of the Condominium Act that, upon nonpayment of an assessment by a unit owner, allowed an association to establish a lien against a unit "without prior notice to the unit owner and without prior hearing or judicial scrutiny." *Golden Sands Club Condo., Inc. v. Waller*, 313 Md. 484, 491 n.5 (1988). In an unreported opinion, this Court had held that those provisions violated due process of law. *Id*. (discussing *Surfside 84 Condo. Council of Unit Owners v. Mullen*, No. 495, Sept. Term 1984 (filed Jan. 28, 1985), *cert. denied*, 306 Md. 370 (1986)).

their lien pursuant to the MCLA. Consequently, the priority of their lien was not determined by the recording date of a statement of lien. Instead, it was determined by the recording date of the lien itself, *i.e.*, the Declaration.

When Long Beach extended its refinance loan to Ms. Mitchell, the Declaration, containing clear language establishing a lien against the Property for the Water and Sewer Charges, was recorded in the land records. In Maryland, the recording of restrictions on lots in a development gives constructive notice of the restrictions to the world at large. *See Turner v. Brocato*, 206 Md. 336, 356–57 (1955) (recording of deeds containing restrictions on lots gave constructive notice of those restrictions). *See also Steuart Transp. Co. v. Ashe*, 269 Md. 74, 93–94 (1973); *Condry v. Laurie*, 184 Md. 317, 320 (1945); *Bourke v. Krick*, 304 F. 2d 501, 503 (4th Cir. 1962).

To be sure, had Long Beach performed a complete title search and not just a two-party title search, it would have had actual notice of the Declaration and therefore of the lien. In any event, it had constructive notice of the lien. As the Declaration was recorded before the DOT was recorded, and Long Beach (and its assigns) had constructive notice of the Declaration, the lien in the Declaration took priority over the DOT.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**