*Select Portfolio Servicing, Inc. v. Saddlebrook West Utility Company, LLC, et al.*
No. 71, September Term 2016


**Real Property Law - Liens - Maryland Contract Lien Act.** The Maryland Contract Lien Act provides a process for creating a lien on real property based on a contractual obligation. A party seeking to establish and enforce such a lien must follow the procedures set forth in the Act. The resulting lien has priority as of the date a statement of lien is recorded in the land records. A declaration recorded by a developer in the land records that creates a contractual obligation on the part of future homeowners to pay an annual assessment to finance the developer's construction of water and sewer infrastructure and that gives notice of a lien for the homeowner's failure to fulfill that obligation does not itself create a lien unless the procedures of the Act are followed. Maryland Code, Real Property Article, §14-201 *et seq.*

IN THE COURT OF APPEALS
OF MARYLAND

No. 71

September Term, 2016

_____

SELECT PORTFOLIO SERVICING, INC.

V.

SADDLEBROOK WEST UTILITY COMPANY,
LLC, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.

_____

Filed: August 16, 2017

A lien on real property is a right based on contract, statute, or common law to have a debt or charge satisfied out of the particular property.[1] Three common points of dispute about a lien are (1) whether one may be established; (2) if so, how; and (3) when it is established. The first two issues relate to the creation of a lien; the third to its priority. With some exceptions, the priority of a lien is determined by the date it is recorded in the land records.

At issue in this case is the use of a lien as part of a deferred financing arrangement for the construction of the water and sewer infrastructure to serve a new home development. There is no dispute that a lien can be created on the developed property to secure the payment of an assessment for the construction of that infrastructure. There is, however, a dispute as to when that lien takes effect – which must be resolved by answering how it is created.

To carry out the deferred financing strategy, the developer in this case, Respondent Saddlebrook West, LLC ("Saddlebrook") made use of an instrument entitled a Declaration, which provided for payments of an annual assessment by future homeowners to a related entity, Respondent Saddlebrook West Utility, LLC ("Utility"). The Declaration, which provided for the granting of a lien by future homeowners to Utility to secure the payment

---

[1] *Montgomery County v. May Dept. Stores Co.*, 352 Md. 183, 195 (1998).

of the annual assessment, purported to give priority to that lien at a date before the development was constructed or any homeowner had granted a lien under the terms of the Declaration.

Petitioner Select Portfolio Servicing, Inc., the holder of deed of trust that arose out of the financing of one of the homes in the development, brought this action to clarify the relative priority of its interest in that property in relation to the lien asserted by Utility for delinquent assessments.

We hold that the Declaration recorded by Saddlebrook did not itself create a lien on the property. Rather, Utility must follow the procedures set forth in the Maryland Contract Lien Act, Maryland Code, Real Property Article ("RP"), §14-201 *et seq.*, to establish a lien under the Declaration with respect to delinquent assessments – as it did on at least two occasions with respect to the particular property that is the subject of this case. The priority of that lien is determined by the date of its recording in the land records.

## I

## Background

*A.*   *Water and Sewer Infrastructure in the Washington Suburban Sanitary District*

The Washington Suburban Sanitary District ("Sanitary District") is comprised of portions of Prince George's and Montgomery Counties. The Washington Suburban Sanitary Commission ("WSSC") is a bi-county state agency established by State law to construct and operate water supply, sewerage, and storm water management systems in the Sanitary District. *See generally* Maryland Code, Public Utilities Article ("PU"), Division II; *see also WSSC v. Phillips*, 413 Md. 606, 630-32 (2010); *WSSC v. Utilities, Inc*, 365 Md.

2

1, 8 (2001); *Katz v. WSSC*, 284 Md. 503, 509 (1979). In 1998, the burden of constructing and paying for new water and sewer facilities in a private development to connect to the WSSC system was shifted from the WSSC to the developer by statute, although the WSSC remains responsible for overseeing that construction and operating the system. Chapter 516, Laws of Maryland 1998, *now codified at* PU §23-201.

This case arises from an instance in which, in accordance with PU §23-201, a developer entered into an agreement with the WSSC to assume responsibility for the construction of water and sewer facilities for a development in part of the Sanitary District located in Prince George's County. The developer then recorded a document entitled a Declaration in the land records of Prince George's County indicating that the expense of creating the infrastructure for the development was to be passed on to future homeowners in the form of an annual assessment. The homeowner's liability was to be secured by a lien granted by the homeowner on the homeowner's property. This case concerns the procedure for establishing that lien and its priority.

### B.     *Facts*

The relevant facts were largely undisputed and were presented at trial through stipulation and documents. To the extent that expert testimony was contested, it had more to do with the relevance of the opinion testimony than its substance.

*Saddlebrook, Utility, and the Subdivision*

In the late 1990s, Saddlebrook planned to develop a residential subdivision known as Saddlebrook West ("the Subdivision") in a portion of Prince George's County that lies within the Sanitary District. Saddlebrook planned ultimately to develop a total of 330 lots.

The dispute in this case relates to the first phase of the Subdivision, which consisted of 187 lots on which single-family homes would be built.

In December 1999, Saddlebrook entered into a memorandum of understanding ("MOU") with the WSSC under which Saddlebrook would be responsible for construction of water and sewer extensions for the Subdivision, subject to the WSSC's inspection and approval. As part of the plan, Utility would undertake the construction to connect the lots in the Subdivision to water and sewer service provided by the WSSC. Responsibility for maintenance of the infrastructure in the future would be shared by the WSSC and the individual lot owners.

On February 4, 2000, Saddlebrook purchased the land on which the project was to be built. The deed was recorded in the land records for Prince George's County on February 17, 2000.

*The Declaration*

On April 4, 2000, Saddlebrook, as "Declarant," executed a "Declaration of Deferred Water and Sewer Charges" ("the Declaration") in favor of Utility with respect to the Subdivision. The Declaration recited that Saddlebrook and Utility would provide water and sewer infrastructure and connections for the lots.[2] To recoup the cost of building that

---

[2] The Declaration also recited that the WSSC would be responsible for maintaining the water and sewer system within public easements in the Subdivision and that lot owners would be responsible for maintaining the systems on their respective lots. The WSSC would bill each lot owner for the supply of water and sewer services – a charge separate from that imposed for construction of the infrastructure.

infrastructure, the Declaration imposed an annual water and sewer charge in 23 equal installments of $700 with respect to each lot in the Subdivision. The charge was to be paid by the lot owner to Utility and would be due on January 1 of each year following conveyance of the lot to the lot owner.[3] Saddlebrook and the builders of the homes in the Subdivision were explicitly excluded from the obligation to pay the annual assessment during the period of time that they owned lots.

One paragraph of the Declaration stated that each lot owner, by accepting deed to a lot, agrees to pay the annual water and sewer charge to Utility and grants Utility a lien to secure payment of that assessment. A later paragraph stated that the lien created with respect to each lot would have priority from the date of the recording of the Declaration in the land records over "any subsequently recorded or created lien, deed of trust, mortgage or other instrument encumbering" a lot. The Declaration stated that, if a lot owner fails to pay an annual assessment, Utility may, among other things, foreclose on the lien against the lot "in the manner now or hereafter provided for the foreclosure of mortgages, deeds of trust or other liens on real property" and foreclose on the lien under the Maryland Contract Lien Act. The Declaration stated that a lot owner grants to Utility a power of sale that could be exercised in the event of foreclosure of a lien. The Declaration did not state the value of the lien it sought to create.

---

[3] The Declaration provided that a lot owner could prepay the assessment in full at a 6% discount.

Finally, the Declaration stated that "[a]ll provisions of this Declaration, including the benefits and burdens, shall touch, concern and run with the land . . . and shall inure to the benefit of" Saddlebrook, Utility, and their successors.

Depending on one's point of view, this method of deferred financing of the water and sewer infrastructure in the Subdivision either disguised the true price of a home in the Subdivision or simply decreased the up-front cost of homeownership and thereby made such housing more affordable.

On May 17, 2000, the Declaration was recorded in the land records of Prince George's County. An exhibit to the Declaration identifies by lot, block, and plat number the 187 lots to which the Declaration pertains. A "Land Instrument Intake Sheet" for the Declaration shows that Saddlebrook paid a $75 recordation charge and a $2 surcharge. No recordation or transfer taxes were charged or paid.

*Construction of Water and Sewer Facilities and Homes in the Subdivision*

Saddlebrook contracted with W.F. Wilson & Sons, Inc., to construct and install the water and sewer facilities for the 187 lots. On November 21, 2000, the WSSC certified that the conditions of the MOU had been satisfied and that service would be provided to those lots.

On October 3, 2001, Saddlebrook entered into a "Lot Purchase Agreement" with Maryland Homes CD, LLC ("Maryland Homes"), a builder, for 46 of the lots. A copy of the Declaration was attached to the Lot Purchase Agreement and "incorporated [t]herein

6

by reference."[4]  Under the terms of the Lot Purchase Agreement, Maryland Homes agreed to disclose the annual deferred water and sewer benefit charge to each subsequent home purchaser as part of the sales transaction.[5]

The 187 lots were conveyed to Maryland Homes by separate deeds that each covered one or more lots.  Maryland Homes built single-family homes on all 187 lots.

*The Property at Issue*

The property that became the setting for the legal issues presented in this case involves a changing cast of characters and a series of anomalies of the type familiar to anyone who has studied recent foreclosure cases:  unsigned documents, missing attachments, incongruous dates, title searches that overlook key filings, deeds endorsed in blank, unpaid assessments, expired liens.  The confluence of these elements provides a bloopers reel for a real property course.[6]  Of course, had everything been done perfectly on all sides, there likely would be no case before us.

---

[4] The copy of the Declaration attached to the Lot Purchase Agreement is manually dated "October 22, 2001" while the copy recorded in the land records has a typewritten date of "April 4, 2000."  In other respects the terms of the two copies appear to be identical. This discrepancy is not material to the issue before us.

[5] *See also* RP §14-117(a)(2) (contract for initial sale of residential property subject to deferred water and sewer charges must disclose estimated cost).

[6] This is not meant as a reflection on the performance of trial counsel who, on the record before us, set a high standard for conducting the trial of a complex case zealously, civilly, and expeditiously.

The property at issue in this case is 8201 River Park Road ("the Property"). It was sold by Saddlebrook to Maryland Homes on November 7, 2001; a deed conveying the lot to Maryland Homes was recorded in the land records on November 13, 2001. The deed states that it is subject to "all easements, covenants and restrictions of record."

On April 1, 2002, Charles Bradley, Jr., purchased the Property from Maryland Homes for $347,388. He financed the transaction with a $351,922 purchase money mortgage. The deed conveying the Property from Maryland Homes to Mr. Bradley, which was recorded in the land records on April 23, 2002, states that it is made "subject to all easements, covenants, and restrictions of record."

*Statements of Lien*

Pursuant to the Declaration, the first annual water and sewer charge on the Property came due on January 1, 2003. Mr. Bradley apparently failed to pay that charge – or the charge that came due the following year on January 1, 2004. As a result, a management company acting on behalf of Utility recorded two "Statements of Lien" in favor of Utility in the land records with respect to the unpaid charges. In particular, on March 1, 2004, a Statement of Lien in the amount of $1,072.50 (plus recording costs of $137.50) was recorded against the Property. On November 17, 2004, a second Statement of Lien in the amount of $1,365.00 (plus recording costs of $213.80) was recorded.[7] Both Statements of

---

[7] The record is not clear on how the precise amounts of the liens were calculated.

Lien recite that the Property is covered by the Declaration and that it is subject to a lien for the amount stated pursuant to the Maryland Contract Lien Act.

*Sale of Property by Mr. Bradley to Ms. Mitchell*

Shortly after the second Statement of Lien was recorded, Mr. Bradley sold the Property to Sherrylyn Mitchell for $565,000.[8]  A deed dated January 6, 2005, conveying the Property from Mr. Bradley to Ms. Mitchell was recorded in the land records on March 8, 2005.  According to a Land Instrument Intake Sheet that appears in the land records with the deed, Ms. Mitchell financed the purchase of the Property with a $480,250 loan secured by a deed of trust.[9]

In the deed conveying the Property, Mr. Bradley represented that he "has not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed[.]"  However, the deed made no reference to the Declaration or Statements of Lien and, unlike the deed that had conveyed the Property to Mr. Bradley, did not explicitly state that it was "subject to all easements, covenants and restrictions of record."

It does appear that, at some point, perhaps unrelated to this particular conveyance, Ms. Mitchell executed a form document entitled "Notice to Purchaser of Deferred Water

---

[8] According to her testimony at the trial of this case, Ms. Mitchell had been living in the Property for "eleven years" as of the time of trial in September 2013 – *i.e.*, since sometime in 2002, well before she purchased the Property.  The record does not disclose the circumstances under which she was living there or her relationship, if any, to Mr. Bradley.

[9] This deed of trust is not included in the record of this case, nor does the record identify the source of the loan.

and Sewer Charges," acknowledging the existence of the annual charge for lots in the Subdivision. While that document refers to "the Lot," it does not identify the lot by address or otherwise. Next to Ms. Mitchell's signature appears the handwritten date "9-1-01." The document also bears a signature of a representative of Maryland Homes (designated in the document as the "Seller") with a date of "9/4/01." These dates are long before the conveyance of the Property by Mr. Bradley to Ms. Mitchell, pre-date the conveyance by Maryland Homes to Mr. Bradley, and indeed, pre-date the Lot Purchase Agreement between Saddlebrook and Maryland Homes. There is no evident solution in the record to this puzzle.[10]

In any event, whatever knowledge either party to the transaction may have had of the annual assessment, the delinquency with respect to the Property, and the action that Utility had already taken under the Maryland Contract Lien Act to establish liens with respect to that delinquency, the Statements of Lien were not paid, cleared, and released upon closing of the sale of the Property by Mr. Bradley to Ms. Mitchell.

*Refinancing the Property with a Predecessor of Select Portfolio*

Ms. Mitchell subsequently sought to refinance the loan on the Property. She applied to Long Beach Mortgage Company ("Long Beach") for a $552,000 loan. In connection with the new loan, Long Beach ordered a two-party title search of the Property – *i.e.*, a

---

[10] Although Ms. Mitchell herself testified briefly at the trial, neither she nor the other parties adduced any evidence providing any further enlightenment concerning this document.

10

search that included Ms. Mitchell and Mr. Bradley, but not prior owners. The title search did not reveal the Declaration. Neither did the title searcher find the two recorded Statements of Lien.

On May 25, 2006, Ms. Mitchell settled on the loan with Long Beach. The loan was secured by a deed of trust in favor of Long Beach ("Deed of Trust"), which was recorded in the land records on August 18, 2006.[11] Presumably because Long Beach was unaware of the Statements of Lien, they were not paid, cleared, and released at closing.

Long Beach apparently sold Ms. Mitchell's loan to JP Morgan Chase Bank, N.A ("Chase").[12] Chase in turn eventually sold the loan to Select Portfolio during the conduct of this litigation. For simplicity, we shall refer to Long Beach, Chase, and Select Portfolio collectively as "the Lender."[13]

*Utility Attempts to Foreclose on the Property*

The record is not clear on whether Mr. Bradley paid the annual assessment due on January 1, 2005, or whether Ms. Mitchell paid the assessments for the years after the

---

[11] The Deed of Trust was re-recorded on November 10, 2009, for the purpose of attaching a legal description of the Property. The re-recording is not material to the issue before us.

[12] There was some dispute at trial over whether there was a fumble in the hand-off from Long Beach to Chase – *i.e.*, whether the documentation was adequate – but that issue is not before us in this appeal.

[13] Chase filed this action and remained the plaintiff through discovery, motions, and trial. Select Portfolio purchased the loan while the case was on appeal and stepped into the shoes of Chase, retaining the same counsel and making the same arguments.

11

Property was conveyed to her. There appears to be no dispute that she did not pay off the liens imposed for the period during which Mr. Bradley owned the Property. In any event, Utility apparently took no action to enforce Statements of Lien before they expired in 2007. *See* RP § 14–204(c) (2007) (requiring an action to foreclose under a statement of lien to be commenced within three years of the date of recordation).[14]

Some years later, on October 7, 2010, Utility commenced a foreclosure proceeding in the Circuit Court for Prince George's County against the Property relating to the unpaid water and sewer charges based on the Declaration itself. On March 5, 2012, the Lender filed a motion to stay and dismiss the foreclosure proceeding. That same day, the Lender filed the declaratory judgment action that gives rise to this appeal. Utility later voluntarily dismissed the foreclosure action.

*Declaratory Judgment Action by the Lender*

The Lender's amended complaint named as defendants Saddlebrook, Utility, Ms. Mitchell, the Saddlebrook West Homeowners Association, Inc. ("the HOA"), and the trustees who filed the foreclosure action on Utility's behalf ("Trustees"). The Lender also named as defendants the Clerk of the Circuit Court for Prince George's County, the Director of the Prince George's County Office of Finance, and the Director of the State Department of Assessments and Taxation (collectively, the "public defendants").

---

[14] The Maryland Contract Lien Act has since been amended to allow a lienholder 12 years to commence an action of foreclosure after a statement of lien is recorded. Chapter 286, Laws of Maryland 2008, *codified at* RP §14-204(c).

The amended complaint alleged, among other things, that the Declaration did not itself create a lien that gave Utility a priority over the Deed of Trust. It stated that, if the Declaration did create a lien, Utility would have had to pay approximately $60,000 in recordation and transfer taxes at the time it was filed and would not have had to record the Statements of Lien under the Maryland Contract Lien Act.

Count I of the amended complaint asked the Circuit Court to declare that the Declaration was not itself a lien against the Property, that Utility had no security interest in the Property, and that the Lender's Deed of Trust was the first priority lien against the Property. On the alternative assumption that the Declaration was intended to create a lien, Count II of the amended complaint sought mandamus relief against the public defendants, requiring them either to collect recordation and transfer taxes from Utility with respect to the Declaration or to remove that document from the land records. Count III of the amended complaint alleged that Saddlebrook and Utility had committed a fraud by drafting the Declaration in a way that concealed from the public and government authorities that it was intended to create a lien directly and asked the court to award compensatory and punitive damages, as well as attorneys' fees.

The Circuit Court awarded summary judgment in favor of the public defendants with respect to the request for mandamus relief in Count II on the ground that there was no justiciable controversy between them and the Lender;[15] the Lender voluntarily dismissed

---

[15] The Circuit Court reiterated this decision at the close of the Lender's evidence at trial.

13

its cause of action for damages in Count III. Following discovery, the case proceeded to trial on Count I with Saddlebrook, Utility, and Ms. Mitchell (who was self-represented) participating as defendants.[16]

*The Trial*

The Circuit Court conducted a bench trial on September 17 and 18, 2013. As noted earlier, the basic facts of the transactions and governing documents were undisputed and presented in the form of a stipulation of facts together with joint exhibits. Testimony concerning the underlying facts was very limited.[17] One of the principals of Saddlebrook was called by the Lender to testify concerning some of the background of the development that resulted in the recording of the Declaration. There was very brief testimony by Ms. Mitchell concerning her purchase and refinance of the Property. A custodian of documents for the Lender identified a deed.

---

[16] As the Court of Special Appeals noted in its opinion in this case, neither the HOA nor the Trustees (who had filed the foreclosure action on behalf of Utility) participated in the trial. Although they technically remained in the case as defendants as of the time of the trial, neither of these defendants had an interest at stake. The HOA apparently agreed with the Lender that the HOA's lien interest in the Property was junior to that of the Lender and the Trustees were joined in the action simply in their capacity as agents of Utility. For the reasons explained by the Court of Special Appeals, there is a final appealable judgment in this case. 229 Md. App. 241, 254 n.10 (2016).

[17] The testimony is outlined in some detail in the opinion of the Court of Special Appeals. 229 Md. App. 241, 255-57 (2016).

Most of the testimony at the trial was provided by expert witnesses. However, instead of offering competing opinions of similar experts, the parties presented opinions from different types of experts.

The Lender presented expert testimony from three individuals with extensive experience with title searches and title insurance. They testified that the Declaration would be regarded as a notice instrument, as opposed to a lien, by the title insurance industry. A title abstractor testified that a lender in a refinance transaction would typically order a "two-party" title examination which, in this case, would not have revealed the Declaration directly, but which should have revealed the Statements of Lien, which reference the Declaration. According to the title abstractor, the Declaration, if discovered, would be reported as an "exception" to the title, but not as a lien or encumbrance on the Property – *i.e.*, it would affect the scope of the title insurance policy, but not the decision to issue the policy.

An attorney for a title insurance company likewise opined that the Declaration would be treated as an exception in a title report – similar to an exception for an easement. The Declaration itself would not be regarded by the title insurer as an existing lien or encumbrance, but rather as notice of the potential creation of a lien for unpaid charges. Discovery of a recording like the Declaration might prompt further inquiry into whether payment of the assessment was current.

In the same vein, an underwriter for a title insurance company opined that the Declaration was a notice instrument which would not affect the willingness of a title

insurance company to issue a policy, as opposed to a lien, which would affect the issuance of a policy.

Saddlebrook and Utility largely did not contest the opinions of the Lender's experts, but argued that they were irrelevant[18] and presented the testimony of a real estate attorney who had drafted similar declarations to the one in this case and who opined that the Declaration in this case was a covenant running with the land that created a lien against the Property.[19]

At the conclusion of the trial, the Circuit Court asked the parties to submit proposed findings of fact and conclusions of law concerning the issues in the case. The parties did so.

*Circuit Court Ruling*

On November 20, 2013, the Circuit Court issued a three-page opinion and order that concluded that the Declaration "is a valid, enforceable first-priority lien encumbering the

---

[18] Saddlebrook argued that the question of whether a title insurance company would disclaim liability by noting an exception for the Declaration in a title insurance policy was a separate question from whether the Declaration established a lien with priority over the Lender's Deed of Trust.

[19] The attorney based much of his testimony on his practice of drafting declarations in compliance with provisions of the Anne Arundel County Code. He conceded that the Prince George's County Code does not include such provisions.

[P]roperty ...."[20]  The court did not explicitly adopt any of the proposed findings of fact or conclusions of law submitted by the parties.

The court held that the Declaration was a covenant running with the land.  The court further reasoned that the Declaration was a "super lien" in favor of Utility that "takes effect" when a lot is sold to the first homeowner – in this case, Mr. Bradley.  Since that event preceded the recording of the Lender's Deed of Trust in the land records, Utility's lien had priority over the Deed of Trust.  The court rejected the Lender's argument that the Declaration, under such an interpretation, would be invalid under the rule against perpetuities.  The court faulted the Lender for not discovering the Declaration by conducting a more comprehensive title search and ruled that the failure of the public defendants to collect recordation and transfer taxes upon the filing of the Declaration did not affect its validity.

While the court did not expressly address the Lender's argument that the Maryland Contract Lien Act is the sole vehicle for enforcement of any lien created under the Declaration, it was implicit in the court's ruling that the Declaration created a first-priority lien that it rejected that argument.

---

[20] The Circuit Court initially issued its opinion and order on November 5, 2013, but later re-issued it to correct a typographical error.

*Appellate Proceedings*

The Lender noted a timely appeal.[21] The Court of Special Appeals affirmed the judgment of the Circuit Court in a thorough opinion. 229 Md. App. 241 (2016). The intermediate appellate court first reviewed Maryland case law concerning the rule against perpetuities and concluded that the Declaration was not unenforceable on that ground. It next agreed with the Circuit Court that the Declaration was a "covenant running with the land" and that the Lender lacked standing to challenge the non-payment of recordation and transfer taxes in connection with the recording of the Declaration. Finally, it turned to the "complex legal question" whether the Declaration itself created a lien with priority over the Lender's Deed of Trust. It concluded that the recordation of the Declaration created a lien that secured the payment of the annual assessment, whether considered in reference to the Maryland Contract Lien Act or otherwise, and that the lien had priority over the Lender's later recorded Deed of Trust on the Property.

The Lender then filed a petition of a writ of *certiorari* which we granted.

---

[21] Only Saddlebrook and Utility have appeared as appellees. The other remaining defendants named in the amended complaint – Ms. Mitchell, the HOA, and the Trustees – have not participated in the appeal.

## II

### Discussion

The Lender has raised three issues, which we describe as follows:

1. Could a lien be created on the Property by the Declaration without following the procedures of the Maryland Contract Lien Act?

2. To the extent that the Declaration purported to establish a lien on the Property, did it violate the rule against perpetuities?

3. Did the Lender have standing to challenge the acceptance of the Declaration by the clerk of court for recording in the land records on the ground of nonpayment of recordation and transfer taxes?

For the reasons set forth below, we answer the first question "no." Accordingly, we need not, and do not, discuss the second and third issues.

### A. *Standard of Review*

Pursuant to Maryland Rule 8-131(c), when an action is tried without a jury, an appellate court reviews the case on both the law and the evidence. We accept the trial court's findings of fact unless they are clearly erroneous. However, we review the trial court's conclusions of law and application of the law to the facts without deference to the trial court. *Tribbitt v. State*, 403 Md. 638, 644 (2008).

### B. *Creation and Enforcement of Liens under the Maryland Contract Lien Act*

We begin with a short review of the provisions and history of the statute that plays a central role in this case – the Maryland Contract Lien Act.

#### 1. The Statute

The Maryland Contract Lien Act addresses the creation and enforcement of a lien on real property arising from a breach of contract. For purposes of the statute, a "contract"

19

is "a real covenant running with the land or a contract recorded among the land records of a county or Baltimore City." RP §14-201(b)(1).[22]

A lien may be created and enforced pursuant to the statute only if: (1) the contract expressly provides for the creation of a lien and (2) the contract expressly describes the party in whose favor the lien is created and the property against which the lien is imposed. RP §14-202(a). The lien is to secure only damages, the cost of collection, late charges, and attorney's fees provided for in a contract or awarded by a court. RP §14-202(b).

To establish a lien, the party seeking to create the lien must, within two years of a breach of the contract, give written notice to the party whose property is to be subject to the lien and include certain information specified in the statute.[23] RP §14-203(a)-(b). Within 30 days after receiving the notice, the property owner may file a complaint in the circuit court contesting the establishment of the lien and requesting a hearing. RP §14-203(c). In that proceeding, the party seeking to impose the lien has the burden of proof. RP §14-203(d). The statute provides additional procedures for the imposition of a lien based on a showing of probable cause pending trial, removal of the lien upon the filing of bond by the property owner, and a trial to determine any issues relevant to establishing or

---

[22] The statute also explicitly includes a declaration or bylaws recorded under the Maryland Condominium Act or the Maryland Real Estate Time-Sharing Act within the definition of "contract." RP §14-201(b)(2).

[23] That information includes identification of the party seeking to create the lien, the property, and the contract, a statement of intent to create the lien, the nature of the breach and the amount of damages, and notice of the property owner's right to a hearing under the statute. RP §14-203(b).

denying a lien. RP §14-203(g) - (k). The statute sets out a format for a "Statement of Lien" for purposes of recording the lien in the county land records. RP §14-203(j).

With respect to enforcement of the lien, the statute provides that the lien may be foreclosed by the party who obtained the lien "in the same manner, and subject to the same requirements, as the foreclosure of mortgages and deeds of trust on property … containing a power of sale or an assent to a decree." RP §14-204(a). The statute preserves the right of the lienholder to bring suit for any deficiency against a person personally liable for the damages. RP §14-204(b). Currently, the statute requires that any foreclosure action be brought within 12 years of the recording of the lien. RP §14-204(c). (As noted earlier, at the time of the events underlying this case, the statute had had a three-year deadline for a foreclosure action).

The statute explicitly excludes land installment contracts, deeds of trust, and mortgages from its purview. RP §14-205.

2.     Legislative History

The legislative history of the statute is instructive. The Maryland Contract Lien Act was enacted in 1985 in response to an appellate decision invalidating a law concerning liens on real property. Chapter 736, Laws of Maryland 1985.

At one time, the Maryland Condominium Act[24] provided that the annual charge owed by an owner of a condominium unit "constitutes a lien" on the unit, with the proviso

---

[24] RP §11-101 *et seq*.

that a statement of lien be recorded within two years after the assessment came due.  RP §11-110(d) (1981).  The Condominium Act further provided that the lien could be enforced through foreclosure.  RP §11-110(f) (1981).  In January 1985, the Court of Special Appeals held, in an unreported opinion, that these provisions were unconstitutional because the statute failed to provide procedural due process to the unit owner.  *Surfside 84 Condominium Council of Unit Owners v. Mullen,* No. 495, September Term 1984 (Ct. Spec. App. January 28, 1985), *cert. denied*, 306 Md. 370 (1986).[25]

In response the *Surfside 84* decision, the General Assembly enacted a broader statutory scheme to govern not only liens arising from condominium assessments, but also those from "a real covenant running with the land, if the contract expressly provides for a lien."  Report of Senate Judicial Proceedings Committee concerning Senate Bill 625 (March 20, 1985).  The new statute, entitled the Maryland Contract Lien Act, was designed to establish procedural rules that comported with due process for establishing, enforcing, or denying a lien based on a contract.  *Id*.  It was modeled on the statute governing mechanics liens.  *See Golden Sands Club Condominium, Inc. v. Waller*, 313 Md. 484, 491

---

[25] The Court of Special Appeals held that the condominium lien procedure constituted state action subject to the due process guarantees of the State and federal constitutions because a lien was recorded in the land records and enforcement was accomplished by instituting court action for foreclosure of the lien.  The intermediate appellate court noted that the Legislature had also apparently been troubled by this lack of procedure as, subsequent to the events in the *Surfside 84* case and prior to enactment of the Maryland Contract Lien Act, the Legislature had amended the Condominium Act to provide for notice to the property owner and a hearing.  Chapter 581, Laws of Maryland 1984.

n.5 (1988). In a bill review letter, the Attorney General concluded that the procedures set forth in the new statute satisfied procedural due process. Letter of Attorney General Stephen H. Sachs to Governor Harry Hughes (May 25, 1985). This Court later confirmed that that assessment. *Golden Sands, supra.* When the Act was amended in 1998 to explicitly encompass assessments related to time share units, the materials related to that legislation reiterated that the Act already applied to "covenants running with the land," among other things. *E.g.,* Floor Report for House Bill 1037 (1998).[26]

### C.      *Application to this Case*

Saddlebrook and Utility take the position that the Declaration itself created a lien. As noted earlier, the Declaration itself asserts that it establishes a lien on each lot, granted at the time a homeowner accepts a deed on the lot, but with priority dating from the earlier recordation of the Declaration. Of course, just because a document says something is so does not make it so. Saddlebrook and Utility look to four sources of authority for their position that the Declaration itself created a lien on the Property: (1) the Maryland Contract Lien Act; (2) the common law; (3) the Maryland Rules; and, for want a better term, (4) the coattails of the WSSC.

*Maryland Contract Lien Act*

The Circuit Court and Court of Special Appeals both concluded that the Declaration created a covenant running with the land. The Lender does not appear to contest that issue

---

[26] That bill was enacted as Chapter 722, Laws of Maryland 1998.

before us. Accordingly, the Declaration fits the definition of "contract" under the Maryland Contract Lien Act, and the establishment and enforcement of a lien for nonpayment of the water and sewer infrastructure assessment under the Act is appropriate. Indeed, that is just what Utility did when it recorded the two Statements of Lien against the Property in 2004. But that does not mean that the Declaration by itself establishes an enforceable lien.

In its opinion in this case, the Circuit Court characterized the Declaration as a "super lien." The use of that label is revealing. As the Court of Special Appeals recounted in its opinion, the label "super lien" has commonly been used to refer to liens that secure assessments owed to homeowner or condominium associations, such as that provided in RP §11-110(d). 229 Md. App. at 281 n.21. As the discussion of the legislative history of the Maryland Contract Lien Act above illustrated, the genesis for the Act was a case involving just such a "super lien."

Saddlebrook and Utility contend, however, that they need not have followed the procedures set forth in RP §14-203 of the Act to establish a lien. They argue that the recording of the Declaration itself established a lien against the Property under the Act as of the date it was recorded.

Saddlebrook and Utility's argument is based on a misunderstanding of the Maryland Contract Lien Act. They contend that the Act provides for two alternative methods for creation of a lien: (1) pursuant to RP §14-202, simply by virtue of the existence of a contract that provides for the creation of lien and (2) pursuant to in RP §14-203, by virtue

24

of a breach of contract, if the procedures set forth in that section are followed.[27]  This is a

misreading of the statute.  The various sections of the Act must read together and, when

one does so, the statute provides a coherent framework for the establishment and

enforcement of liens that addresses the problem the statute was designed to remedy.

RP §14-201 contains the basic definitions applicable to the statute.  RP §14-202

defines the universe of contracts for which a lien may be created and the extent of the lien

– *i.e.*, the contract has to expressly provide for the creation of a lien and must explicitly

describe the property and party involved; a lien may only secure payment of the listed

items.  In particular, a lien may only secure damages and related costs, which necessarily

relates the lien to a breach of the contract.  RP §14-203 then sets forth the specific

procedures that must be followed to establish a lien as a result of that breach.  RP §14-204

then sets forth how the lien, once established, may be enforced.

The process under the statute to create and enforce a lien thus proceeds as follows:

> 1 – There must be a contract or covenant running with the land recorded in the land records.  (RP §14-201(b)).
>
> 2 – The contract or covenant must expressly provide for the creation of a lien, identify the party entitled to establish and enforce the lien, and identify the property against which a lien may be imposed.  (RP §14-202(a)).
>
> 3 – Upon breach of the contract or covenant, the party seeking to create the lien must provide notice to the property owner of the claimant's intent to impose a lien and, after following the Act's procedures, record a statement of lien

---

[27] The Court of Special Appeals apparently accepted this reading of the Act.  229 Md. App. at 283, 291.

25

that secures the damages resulting from the breach and related expenses. (RP §14-203).

4 – The party seeking to enforce the lien may then foreclose on the lien in the same manner of a deed of trust. (RP §14-204).

Under the view of Saddlebrook and Utility, RP §14-202 allows for creation of a lien simply by virtue of the existence of a contract without any need to follow the procedures set forth in the remainder of the Act. The dichotomy that Saddlebrook would read into the statute is inconsistent with the statutory language. The statute specifies that a lien is to secure "damages" and related costs – *i.e.*, the monetary remedy for a breach of contract. Thus, a lien under the statute always relates to a breach of the contract. A lien is not created on the date of the recording of the contract because presumably it has not yet been breached and there are no damages to secure.

Saddlebrook and Utility's construction of the statute is not only inconsistent with the structure and language of the Act, but it is at odds with the legislative history of the Act. As noted above, the primary purpose of the Act was to provide procedures that comported with constitutional requirement of procedural due process. *See Golden Sands*, 313 Md. at 493 ("Under the Contract Lien Act, … no lien attaches until after the [property] owner has had an opportunity to be heard"). It would be completely at odds with that purpose to provide for the creation of a lien by virtue of a contract alone and exempt it

from the procedures that the statute created. Nothing in the legislative history of the statute supports such a reading.[28]

The Declaration may be a contract for purposes of the Maryland Contract Lien Act, and, as required by RP §14-201(b), recording the Declaration was an essential step for establishing a lien under the Act. But the Declaration itself is not a statement of lien and, unless Utility follows the procedures set forth in RP §14-203 (as it did on two occasions with respect to the Property), it does not have a lien under the Act for unpaid assessments.

*Maryland Common Law*

Saddlebrook and Utility also assert that the Declaration created a lien itself under the common law, regardless of whether it did so pursuant to the Maryland Contract Lien Act. They identify no authority for a common law right to create such a lien that is not a deed of trust, mortgage, or land installment contract.[29]

---

[28] This may be an instance in which headings added by legal publishers have been given excessive weight in reading the statute by a party hoping to reach a desired interpretation. The Lexis publication of the statute entitles RP §14-202 "Creation of lien by contract" and RP §14-203 "Creation of lien as a result of breach of contract," suggesting a false parallelism between the two sections. Neither of those headings was enacted by the General Assembly. (Indeed, Westlaw attaches slightly different headings in its publication of the Act). Captions can speak loudly, but it must be remembered that they do not speak for the General Assembly. Even if the General Assembly had adopted those headings, they are not evidence of legislative intent. *See* Maryland Code, General Provisions Article, §1-208.

[29] Deeds of trust, mortgages, and land installment contracts are explicitly excluded from the purview of the Maryland Contract Lien Act. RP §14-205. The Court of Special Appeals acknowledged in its opinion that there were no Maryland cases supporting Saddlebrook's effort to find a basis in the common law. The intermediate appellate court looked to a single case from Florida where, it perhaps goes without saying, the Maryland Contract Lien Act does not apply. 229 Md. App. at 285-88.

*Maryland Rules*

Saddlebrook and Utility also attempt to find a basis for the creation of a lien by the Declaration in the definitions in the foreclosure rules adopted by this Court that are codified in Title 14 of the Maryland Rules. *See* Maryland Rules 14-201 *et seq*. The adoption of rules of procedure is not an occasion for the creation of substantive law concerning interests in real property and, even if it was, the rules in question govern the procedures for *foreclosure* of a lien, not the *creation* of the lien.

In any event, the portions of the rules cited by Saddlebrook and Utility do not advance their argument.[30] In particular, they cite Maryland Rule 14-202(h), which defines a "lien" as "a statutory lien or a lien upon property created or authorized to be created by a lien instrument." They also cite Rule 14-202(i), which defines "lien instrument" to mean "any instrument creating or *authorizing the creation of a lien* on property, including: (1) a mortgage; (2) a deed of trust; (3) a land installment contract, as defined in Code, Real Property Article, § 10-101(b); (4) *a contract creating a lien pursuant to [the Maryland Contract Lien Act];* (5) a deed or other instrument reserving a vendor's lien; or (6) an instrument creating or authorizing the creation of a lien in favor of a homeowners' association, a condominium council of unit owners, a property owners' association, or a community association." (emphasis added).

---

[30] Saddlebrook and Utility cite sections (f) and (g) of Maryland Rule 14-202. Since this case began, those sections have been recodified as sections (h) and (i). We refer to them by their current designations.

The Declaration fits quite comfortably into this definition of "lien instrument" – *i.e.*, it authorizes creation of a lien under the Maryland Contract Lien Act. A statement of lien obtained under the procedures of the Act, such as those that Utility twice obtained against the Property in this case, is a "lien" under the rule as "a lien upon property … authorized to be created by a lien instrument" – *i.e.*, the Declaration. Nothing in the rule purports to authorize a document like the Declaration to create a lien independent of the substantive law.

*Coattails of the WSSC*

At oral argument, Saddlebrook and Utility cited the 1998 legislation – now codified in PU §23-201 – that shifted responsibility for constructing water and sewer infrastructure from the WSSC to developers. They analogized the financing arrangement created by Saddlebrook to front foot benefit assessments that had been charged by the WSSC. Saddlebrook and Utility suggested that, because of the role given a developer by that legislation, the Declaration should have the same lien priority over the Lender's Deed of Trust as a front foot benefit assessment charged by a governmental entity. While creative, that argument is unpersuasive. Saddlebrook is not a governmental entity. It has pointed to no statute or other authority that would endow it with the priority of a municipal or governmental lien.

It is true that Saddlebrook entered into an MOU with the WSSC. But that MOU merely requires Saddlebrook to build the water and sewer infrastructure in accordance with the WSSC's design guidelines and provided for the WSSC to assume control of that infrastructure to serve homeowners in the development. That arrangement did not require

29

Saddlebrook to finance its obligations under the MOU, much less address the details of any such financing. And the MOU does not give a lien related to that financing a lien priority that it would not otherwise have.

*Summary*

The Declaration, as a covenant that runs with the land, falls within the definition of "contract" under the Maryland Contract Lien Act. A lien to secure the payment of delinquent water and sewer charges owed under the Declaration may be established and enforced under the provisions of that Act. The Declaration does not create a lien itself that is enforceable without following those procedures.

To the extent that the language of the Declaration attempted to establish priority for a lien that did not exist, we do not give it effect. In particular, paragraph 5 of the document purported to establish priority for any lien authorized by the Declaration as of the date of the recording of the Declaration, while under Paragraph 2 of the document no lien would even exist until "granted" by a lot owner – an event that could occur long after the recording of the Declaration. The Declaration was recorded before the lots were sold to owners who were then obligated to pay a yearly fee to Saddlebrook. Simply stated, the Declaration was recorded before anyone had a duty to pay an assessment.

Finally, we observe that, until they pursued the aborted foreclosure action that led to this case, Saddlebrook and Utility apparently treated the Declaration as a contract that allowed for the creation of a lien if the contract was breached. At the time of recording, Saddlebrook appeared to treat the Declaration as a notice instrument and did not pay

recordation or transfer taxes, as it would have if the Declaration itself established a lien.[31]

Similarly, when the lot owner of the Property failed to pay the annual assessment, Utility followed the procedures set forth in RP §14-203 to file a statement of lien against the property.

**III**

**Conclusion**

For the reasons set forth above, we hold that the Declaration is not itself a lien on the Property, but instead authorizes the establishment of a lien pursuant to the Maryland Contract Lien Act.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH INSTRUCTIONS TO VACATE THE DECLARATORY JUDGMENT PREVIOUSLY ENTERED AND TO ENTER A NEW DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

---

[31] Under the Tax-Property Article, a recordation tax is imposed on any instrument recorded in the land records based on the principal amount of the lien at the time of recordation. Maryland Code, Tax-Property Article, §§12-101(f)(1)(ii), 12-102, 12-105(f)(1). This is not to say that non-payment of those taxes would invalidate the lien, if the Declaration in fact created one. Rather, it is evidence that the developer itself did not perceive the recording as creating a lien.